John Gueli (Bar No. 171914)
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY 10022-6069
Telephone:  (212) 848-4000
Email:  jgueli@shearman.com

Peter Brandt (Bar No. 241287)
THE HUMANE SOCIETY OF THE
UNITED STATES
1255 23rd Street, NW, Suite 450
Washington, DC 20037
Telephone:  (202) 452-1100
Email:  pbrandt@humanesociety.org

*Attorneys for Plaintiff, The Humane
Society of the United States*

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION**

| | |
|---|---|
| THE HUMANE SOCIETY OF THE UNITED STATES, | Case No. _____ |
| Plaintiff, | **COMPLAINT** |
| v. | |
| UNITED STATES DEPARTMENT OF AGRICULTURE, ANIMAL AND PLANT HEALTH INSPECTION SERVICE, VETERINARY SERVICES, KEVIN SHEA, BURKE HEALY, MARK DAVIDSON, | |
| Defendants. | |

**INTRODUCTION**

1.      Industrialized poultry facilities are ideally suited for influenza viruses to multiply and mutate into catastrophically contagious and deadly forms.  Avian Influenza, commonly known as bird flu, is a virus with multiple strains that causes varying degrees of clinical illness in chickens, other animals, and humans.  Highly pathogenic Avian Influenza ("HPAI") is an "extremely infectious and fatal" form of the virus that spreads rapidly within and between flocks or herds and can disastrously affect humans.[1]

2.      Preventing both the creation and spread of highly infectious and lethal disease is of paramount importance and should be a top priority for the federal government.  Nearly five years ago, Plaintiff, the Humane Society of the United States ("HSUS"), asked the United States Department of Agriculture ("USDA" or "the Agency") to do just that—consider how its HPAI control plan can help prevent the development and spread of highly pathogenic zoonotic diseases.  HSUS requested that animals raised for food or egg production be placed in cage-free low stocking density environments, which would help slow the mutation and spread of diseases like Avian Influenza.  As HSUS proposed, the Agency could accomplish this by conditioning the indemnification payments it makes to producers—for birds and eggs

---

[1]      USDA APHIS, HIGH PATHOGENICITY AVIAN INFLUENZA CONTROL IN COMMERCIAL POULTRY OPERATIONS – A NATIONAL APPROACH: ENVIRONMENTAL ASSESSMENT 5 (July 2015) [hereinafter July 2015 EA].

that must be destroyed during an outbreak response—on their adoption of safe and effective management practices.

3. Instead, USDA decided to essentially subsidize the dangerous and cruel confinement of billions of birds nationwide, despite being fully aware of the causal connection between dense confinement and the frequency and severity of bird flu outbreaks.  The Agency's "preferred alternative" plan permits the reimbursement of taxpayer dollars to the same farms whose poultry confinement practices helped incubate and spread disease in the first place, thereby allowing farms to maintain inhumane practices that will inevitably cause the cycle of outbreak to begin again. An outbreak response plan that indemnifies these industrialized animal operations, as USDA's plan does, illogically supports practices that threaten to expose every human to more frequent and more life-threatening pandemics.

4. The "preferred alternative" plan also permits the killing and disposal of birds using practices that are hazardous to the environment and public health, including burying carcasses in unlined pits, burning them through open-air incineration, and the mass deployment of ventilation shutdown ("VSD"), which entails slowly suffocating and cooking the birds to death.

5. This action challenges Defendant USDA, Animal and Plant Health Inspection Service ("APHIS") Veterinary Services' December 2015 Final Environmental Assessment, *High Pathogenicity Avian Influenza Control in*

*Commercial Poultry Operations – A National Approach* (the "Final EA"),[2] which adopts the "preferred alternative" plan but ignores the most logical alternative, and associated Finding of No Significant Impact ("FONSI"), in which APHIS[3] provides a legally inadequate assessment of containment options in response to the outbreak of an Avian Influenza strain affecting poultry throughout the United States, in violation of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4347; the implementing Council on Environmental Quality ("CEQ") regulations, 40 C.F.R. §§ 1500–1508; and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706. Plaintiff seeks (i) a declaration that the Final EA and FONSI are contrary to law and (ii) an order requiring APHIS to prepare an Environmental Impact Statement ("EIS") that satisfies the requirements of NEPA.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. 701, *et seq.* because the United States is a defendant and Plaintiff's claims arise under federal law.

---

[2]     USDA APHIS, HIGH PATHOGENICITY AVIAN INFLUENZA CONTROL IN COMMERCIAL POULTRY OPERATIONS – A NATIONAL APPROACH:  FINAL ENVIRONMENTAL ASSESSMENT (Dec. 2015) [hereinafter Final EA].

[3]     APHIS, as used throughout this Complaint, refers to Defendant United States Department of Agriculture, Animal and Plant Health Inspection Service, Veterinary Services.

7.     Venue is proper under 28 U.S.C. § 1391(e)(1) because a substantial part of the Defendant Agency's violations of law occurred in this District, and injury to Plaintiff and its members occurred in this District.  Moreover, Plaintiff maintains offices in this District.

## **PARTIES**

8.     Plaintiff HSUS is a nonprofit organization headquartered in Washington, D.C., with regional offices and several direct animal care facilities located throughout the country.  HSUS's mission is to "prevent animal cruelty, exploitation and neglect and to protect wild habitats and the entire community of life."[4]  HSUS promotes humane and environmentally sustainable agriculture, which includes fighting to stop the abuse of farm animals, degradation of the environment, and detriment to human health that are associated with modern industrial agriculture systems.  HSUS and its members commit their resources to improving the lives of chickens and birds, among many other animals, in concentrated animal feeding operations ("CAFOs").  HSUS has an organizational interest in receiving adequate information to educate its members regarding the animals, including chickens and other poultry, that they support through their membership, and how those animals are impacted by federal actions.  HSUS has commented on these actions and expended significant resources

---

[4]  *Our Mission*, HSUS, https://www.humanesociety.org/our-policies#statement-2.

COMPLAINT                                         CASE NO. _____

5

on advocating for alternative approaches.  HSUS also has significant experience in challenging actions that harm animals under NEPA.

9.    HSUS has millions of members and supporters, many of whom live, work, and recreate in areas at risk of being impacted by the harms associated with the mass deployment of VSD, unlined burial pits, open-air burning, and other dangerous disposal and depopulation methods authorized by APHIS, including within this District.[5]  HSUS members therefore have an aesthetic and recreational interest in ensuring the areas where they live, work, hike, photograph, bird-watch, or swim are not affected by dangerous water and air pollutants or damaged by disturbing views of piles of poultry corpses and their accompanying odors.  HSUS members also have a health and safety interest in preventing the spread of HPAI to humans.  HSUS members who own farm animals have an economic interest in preventing the spread of HPAI to their animals.[6]  Moreover, these members have an interest in preventing

---

[5]    Avian Influenza has been detected in poultry populations throughout California in the years since the 2014–15 HPAI outbreak.  *See, e.g.*, *Avian Influenza Updates*, CAL. DEP'T OF FOOD AND AGRIC., https://www.cdfa.ca.gov/AHFSS/Animal_Health/Avian_Influenza.html (listing Avian Influenza outbreaks in California since 2015).  As recently as 2018, California was recognized as having environmental conditions "favorable for AIV [Avian Influenza Virus] presence, and thus future outbreaks (in poultry and waterfowl) are likely to occur" in high risk areas across the state, including in counties located within this District.  Jaber Belkhiria et al., *Identification of High Risk Areas for Avian Influenza Outbreaks in California Using Disease Distribution Models*, PLOS ONE, Jan. 2018, at 9, 11, https://doi.org/10.1371/journal.pone.0190824.

[6]    HPAI spreads to pigs as well as birds.  *See, e.g.*, Clement Meseko et al., *Evidence of Exposure of Domestic Pigs to Highly Pathogenic Avian Influenza*

---

COMPLAINT

CASE NO. _____

6

the development of HPAI in the areas they keep animals.  When an infected flock is identified, the government commonly establishes a control area wherein it will kill all birds in a 10 to 15-kilometer radius, possibly including HSUS members' animals. One such member owns an organic-certified, multi-generational farm and raises pigs and egg laying hens that spend their days outside on pasture.  HSUS members also benefit from adequate environmental impact analyses of a government agency's outbreak response plans—informed by HSUS's participation in that process on its members' behalf—as these plans affect their health, aesthetic, financial, and recreational interests, and proper consideration of these impacts could help mitigate those effects.

10.     Defendant USDA APHIS, Veterinary Services is an agency of the United States government that, pursuant to the Animal Health Protection Act, 7 U.S.C. § 8301 *et seq.*, is responsible for protecting and improving the health, quality, and marketability of US animals, animal products, and veterinary biologics by (1) preventing, controlling, and/or eliminating animal diseases, and (2) monitoring and promoting animal health and productivity.

11.     Defendant Kevin Shea is the Administrator of USDA APHIS.  He is sued in his official capacity.

*H5N1 in Nigeria*, SCIENTIFIC REPORTS (Apr. 12, 2018), https://www.nature.com/articles/s41598-018-24371-6.

COMPLAINT                                CASE NO. _____

7

12.     Defendant Dr. Burke Healy is the Deputy Administrator of Veterinary Services and Chief Veterinary Officer of APHIS.  In his prior role as Executive Director for Veterinary Services' Surveillance, Preparedness, and Response Unit, he served as the National Incident Commander for the HPAI outbreak of 2014–2015. He is sued in his official capacity.

13.     Defendant Dr. Mark Davidson is the Associate Administrator of APHIS. From November 2013 to February 2018, he served as Veterinary Services' Associate Deputy Administrator.  He is sued in his official capacity.

## STATUTORY AND REGULATORY FRAMEWORK

### I.     National Environmental Policy Act

14.     NEPA is the United States' "basic national charter for the protection of the environment."  40 C.F.R. § 1500.1(a).  "NEPA procedures must insure that environmental information is available to public officials and citizens *before* decisions are made and *before* actions are taken."  *Id.* § 1500.1(b) (emphasis added). "Public scrutiny [is] essential to implementing NEPA."  *Id.*

15.     NEPA requires federal agencies to prepare a "detailed" EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).  Accordingly, when an agency proposes to undertake an "action," the agency must first determine whether the action is one that "normally requires" the preparation of an EIS pursuant to NEPA and its implementing regulations.  40 C.F.R. § 1501.4(a).

16.     If the agency is not certain whether an EIS is required, it must prepare an Environmental Assessment ("EA") to determine whether to prepare an EIS or instead issue a FONSI.  *Id.* § 1501.4(b).  The EA must discuss the need for the proposal, evaluate alternatives that would cause less adverse environmental impacts, and provide sufficient evidence and analysis to support the agency's determination as to whether the proposed action will significantly affect the environment.  If an action *may* have a significant effect on the environment, or even if there are *substantial questions* as to whether it may, the agency *must* prepare an EIS.

17.     The Council on Environmental Quality ("CEQ") promulgated regulations implementing NEPA that are "binding on all Federal agencies."  40 C.F.R. § 1500.3.  They instruct that analysis of whether an action will have a "significant" impact on the environment—thus warranting the preparation of an EIS—requires considerations of "context" (effects at the national, regional, and local levels) and "intensity" (the severity of the impact).  *Id.* § 1508.27.

18.     Ten "intensity" factors help determine whether an agency action may cause significant impacts.  *Id.* § 1508.27(b).  Such factors include:

- "Unique characteristics of the geographic area such as proximity to . . . prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas;"

- Effects that are "highly uncertain or involve unique or unknown risks" or "likely to be highly controversial;"

- The "cumulative impacts" of the proposed action;

- "The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973;" and

- The extent to which the action threatens violation of other laws.

*Id.* The presence of even one of the factors may require preparation of an EIS.

19.    NEPA requires that agencies take a "hard look" at the environmental effects of their planned action, even after a proposal has received initial approval. *See Ctr. for Biological Diversity v. Nat'l Hwy. Traffic Safety Admin.*, 538 F.3d 1172, 1194 (9th Cir. 2008). Both an EIS and an EA must discuss a proposed action's direct, indirect, and cumulative effects. *Id.* § 1502.16. Direct effects are "caused by the action and occur at the same time and place," whereas indirect effects are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8. Cumulative effects are "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." *Id.* § 1508.7.

20.    For purposes of NEPA, "federal actions" include "circumstance[s] where the responsible officials fail to act and that failure to act is reviewable by courts or administrative tribunals under the [APA] or other applicable law as agency action." *Id.* § 1508.18. "Actions include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by

federal agencies; new or revised agency rules, regulations, plans, policies, or procedures; and legislative proposals." *Id.* § 1508.18(a).

## II.    The Administrative Procedure Act

21.    NEPA does not contain an internal standard of review, so judicial review is therefore governed by the APA.  Under the APA, courts "shall hold unlawful and set aside" agency action, findings, or conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" or "without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (D).

22.    Where an agency fails to adequately analyze a project's environmental impact in an EA and fails to provide a reasoned and convincing explanation for its decision to not prepare an EIS, it has acted arbitrarily and capriciously in violation of the APA and NEPA.

## III.    The Federal Clean Water Act

23.    The Clean Water Act ("CWA") serves to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).  It operates in large part by controlling the discharge of pollution from point sources into waters of the United States.  *See, e.g.*, *id.* §§ 1342, 1362(14).

24.    Among other things "the term point source means any . . . concentrated animal feeding operation . . . from which pollutants are or may be discharged." *Id.* § 1362(14).

COMPLAINT                                                                    CASE NO. _____

11

25.     The CWA proscribes "the discharge of *any* pollutant by *any* person" except in circumstances as specified by the CWA.  *Id.* § 1311(a) (emphasis added).

## IV.   **The Clean Air Act**

26.     The Clean Air Act ("CAA") serves to "protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population,"  42 U.S.C. § 7401(b)(1), and to "encourage . . . Federal, State, and local governmental actions . . . for pollution prevention."  *Id.* § 7401(c).

27.     Under the CAA, noncompliance penalties are imposed against every person who owns or operates a stationary source[7] that does not comply with the requirements of the Act.  *Id.* § 7420(a)(2)(A).  The CAA limits hazardous pollutants through emission standards.  *Id.* § 7412(d).  Tetrachlorodibenzo-p-dioxin (also known as "dioxin"[8]) is considered a hazardous air pollutant under the CAA.  *Id.* § 7412(b)(1).

---

[7]     "The term 'stationary source' means generally any source of an air pollutant except those emissions resulting directly from an internal combustion engine for transportation purposes or from a nonroad engine or nonroad vehicle[.]"  42 U.S.C. § 7602(z).

[8]     *2,3,7,8-Tetrachlorodibenzo-P-dioxin*, NAT'L CENTER FOR BIOTECHNOLOGY INFORMATION, https://pubchem.ncbi.nlm.nih.gov/compound/Tetradioxin#section=Top  (last visited April 5, 2020) ("2,3,7,8-Tetrachlorodibenzo-p-dioxin . . . is often referred to simply as dioxin and is the reference for a number of compounds which are similar structurally and have dioxin-like toxicity. [It is] extremely toxic to mammals, with a wide variation in sensitivity among species. Longer-term exposure of test mammals to lesser amounts can affect reproduction,

---

COMPLAINT

CASE NO. _____

## V.   The Endangered Species Act

28.    It is unlawful to "take" an endangered species of fish or wildlife.  16 U.S.C. § 1538(a)(1)(B).  Within the meaning of the Endangered Species Act ("ESA"), to take means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  *Id.* § 1532(19).

## VI.   The Migratory Bird Treaty Act

29.    The Migratory Bird Treaty Act ("MBTA") makes it unlawful to "take, capture, kill, [or] attempt to take, capture, or kill . . . any migratory bird . . . ."  *Id.* § 703(a).

## VII.   The Bald And Golden Eagle Protection Act

30.    The Bald and Golden Eagle Protection Act penalizes anyone who "knowingly, or with wanton disregard for the consequences of his act take[s] . . . any bald eagle commonly known as the American eagle, or any golden eagle . . . ."  *Id.* § 668(a).

## FACTS GIVING RISE TO CAUSES OF ACTION

31.    In 2014, the U.S. poultry industry produced 8.54 billion broilers (*i.e.*, chickens bred and raised specifically for meat production), 238 million turkeys, and

---

cause birth defects, damage the liver and suppress the immune system. Several studies suggest that exposure to TCDD increases the risk of several types of cancer in people.").

---

COMPLAINT                                    CASE NO. _____

over 365 million hens that laid roughly 101 billion eggs.[9]  According to the 2012 Census of Agriculture, 21,000 farms produced 5 million ducks primarily in California, Indiana, and Pennsylvania, while about 10,000 farms produced 106,000 geese, primarily in Texas, South Dakota, and California.[10]  Moreover, over 8 billion chickens were slaughtered for human consumption throughout the U.S. in 2012, primarily in the southeast and west coast regions.[11]

32.    Most of these birds are produced in factory farm systems where they are tightly confined in conditions that incubate and spread disease.  Any one of these billions of factory-farmed animals may produce a novel Avian Influenza that could do extraordinary harm to the U.S. food supply and potentially to humans.  Bird flu is a recurring problem with epidemic and pandemic potential.  For example, as recently as March 2020, the USDA notified the World Organisation for Animal Health (formerly, the "OIE") of multiple low pathogenic Avian Influenza infections on farms in two counties in North Carolina.[12]

---

[9]    Final EA at 13.

[10]    *Id.* at 12–13.

[11]    *Id.*

[12]    Fabian Brockotter, *Multiple LPAI Infections in US Turkey Operation*, POULTRY WORLD (Mar. 19, 2020), https://www.poultryworld.net/Health/Articles/2020/3/Multiple-LPAI-infections-in-US-turkey-operation-557469E/.

33.     Recently, a new HPAI strain, H5N6, has been detected in thousands of birds across several Asian and European countries.[13]  In March 2017, a HPAI strain, H7N9, sickened two commercial chicken breeder flocks in Tennessee.[14]

34.     In December 2014, APHIS identified two highly pathogenic, mixed-origin HPAI strains affecting wild bird, backyard, and commercial poultry flocks in the Pacific, Central, and Mississippi flyways.[15]  The Pacific Flyway is a migratory bird path that extends through Alaska, Arizona, California, Idaho, Nevada, Oregon, Utah, Washington, and portions of other western U.S. states.

35.     In 2015, 223 detections of HPAI were reported in fifteen U.S. states, including throughout California, affecting roughly 50 million chickens and turkeys nationwide ("2015 HPAI outbreak").[16]

36.     All told, USDA estimates the 2015 HPAI outbreak and the response to it cost the US economy between one and $3.3 billion.  Importantly, according to the

---

[13]     Jackie Linden, *New Avian Flu Outbreaks Impact China, India, Philippines*, WATTAGNET (Mar. 19, 2020), https://www.wattagnet.com/articles/39870-new-avian-flu-outbreaks-impact-china-india-philippines?v=preview.

[14]     *2nd Case of HPAI Detected in Tennessee*, THE CHATTANOOGAN (Mar. 16, 2017), https://www.chattanoogan.com/2017/3/16/344040/2nd-Case-Of-HPAI-Detected-In-Tennessee.aspx.

[15]     Final EA at 5.

[16]     *Id.* at 6–8.

COMPLAINT                                                    CASE NO. _____

World Organisation for Animal Health, investing in preventing outbreaks is far cheaper than trying to contain them, and investments in prevention pay off well.[17]

37.     In July 2015, APHIS prepared its first EA addressing the impacts of HPAI and APHIS's corresponding response ("July 2015 EA").  APHIS was statutorily required to prepare a "detailed statement" of "alternatives to the proposed action." 42 U.S.C. § 4332(2)(C).  Instead, APHIS's inadequate evaluation considered only two responses to an HPAI crisis:  (1) do nothing (*i.e.*, placing the burden of handling an HPAI epidemic on state and local authorities), or (2) continue "to provide assistance to States and local authorities in establishing and enforcing HPAI quarantines and conducting bird flu control activities as outbreaks occur throughout the nation" (the "preferred alternative").[18]

38.     The preferred alternative permits the use of hazardous depopulation methods without appropriately assessing their environmental impact, including VSD—a highly dangerous and extremely cruel practice that involves shutting down a facility's entire ventilation system, which causes a build-up of carbon dioxide and heat in the facility that suffocates the birds.  This essentially cooks the conscious

---

[17]     The World Organisation for Animal Health & Agra CEAS Consulting, *Prevention and Control of Animal Diseases Worldwide:  Economic Analysis – Prevention Versus Outbreak Costs* 12–14 (2007), https://www.oie.int/fileadmin/Home/eng/Support_to_OIE_Members/docs/ppt/ OIE_-_Cost-Benefit_Analysis__Part_I_.pdf.

[18]     *See* July 2015 EA at 7.

birds to a protracted, and unnecessarily torturous death.  The preferred alternative also permits disposal methods that pose significant risks, such as incineration and burial in unlined pits.  Using these disposal methods, the carcasses of infected birds are broken down, and their bodily fluids, chemical and biological leachate components, agricultural dust, and other gases (including dioxin[19]) are released into the surrounding environment, threatening the health and safety of both humans and wildlife.

39.    In August 2015, APHIS issued its FONSI with respect to the July 2015 EA, concluding "there would be no significant impact to the human environment from the implementation of the preferred alternative."[20]  On September 4, 2015, APHIS made the July 2015 EA and FONSI available to the public for review and comment.[21]

40.    On October 5, 2015, HSUS submitted a comment on APHIS's national approach to HPAI control, which emphasized the detrimental impacts of APHIS's proposed depopulation and disposal plan and explained how it violated NEPA, as

---

[19]    Dioxin can cause liver and immune system damage, birth defects, and reproductive problems, and has been traced to cancer in some people. *See* NAT'L CENTER FOR BIOTECHNOLOGY INFORMATION, *supra* note 8.

[20]    USDA APHIS, Finding of No Significant Impact for High Pathogenicity Avian Influenza Control in Commercial Poultry Operations – A National Approach (Aug. 2015) [hereinafter FONSI].

[21]    Highly Pathogenic Avian Influenza; Availability of an Environmental Assessment and Finding of No Significant Impact, 80 Fed. Reg. 53,485 (Sept. 4, 2015).

reflected in this complaint.[22]  Notably, HSUS's comment proposed reasonable and viable alternatives to APHIS's plan, including conditioning APHIS's indemnification of poultry producers' depopulated livestock on such producers limiting the stocking density of the birds housed in their farms and facilities, rather than on the number of birds culled by the producer.[23]  HSUS made it clear that "APHIS should require producers to agree that all their birds be kept cage free and given enough space to spread their wings and turn around freely."[24]  As HSUS suggested, conditioning the USDA's reimbursement of poultry producers for lost stock on their adoption of improved confinement measures would help limit future HPAI outbreaks from rapidly spreading and potentially causing significant harm to humans, animals, and the environment.

41.   In December 2015, APHIS published a supplemental EA setting forth an HPAI containment plan that was essentially identical to the original inadequate EA.[25] In the Final EA, APHIS failed to broaden the scope or depth of its analysis of alternative containment approaches and failed to sufficiently respond to the serious concerns raised by HSUS in its comment.  Significantly, APHIS's Final EA

---

[22]   HSUS, Comment Letter on Environmental Assessment for High Pathogenicity Avian Influenza Control in Commercial Poultry Operations – A National Approach (Oct. 5, 2015) [hereinafter HSUS Comment].

[23]   *Id*. at 14–18.

[24]   *Id*. at 16.

[25]   *See* Final EA.

materially ignored the alternative proposal in HSUS's comment to establish

indemnification conditions that would create effective safeguards to curb the harmful

impacts of a future outbreak.  In response to the suggestion that it should "reduce the

number of birds allowed in poultry houses[,]" APHIS simply noted that "APHIS and

the poultry industry agree that the impact of an HPAI outbreak is amplified where

poultry production is highly concentrated or networked," but that "APHIS is not

going to adopt this type of governmental restriction at this time."[26]  Instead, APHIS

essentially reaffirmed its FONSI and declined to prepare an EIS.

42.    APHIS declined to prepare an EIS despite having conducted an EIS in

December 2015, entitled *Carcass Management During a Mass Animal Health*

*Emergency* ("Carcass Management EIS"), analyzing the environmental impacts of

various carcass management alternatives that could be implemented as part of an

HPAI outbreak crisis.[27]  As discussed below, APHIS's preparation of the 2015

carcass management EIS further demonstrates the need for an HPAI-Specific EIS.

43.    As set forth below, APHIS's analyses are egregiously insufficient to

satisfy NEPA for several reasons, including for failing to sufficiently evaluate

---

[26]    *Id*. at 77.

[27]    USDA APHIS, FINAL PROGRAMMATIC ENVIRONMENTAL IMPACT STATEMENT, CARCASS MANAGEMENT DURING A MASS ANIMAL HEALTH EMERGENCY, at v (2015) [hereinafter Carcass Management EIS].

reasonable alternatives, inadequately examining the consequences, environmental impacts, and adverse effects of its actions, and failing to prepare an EIS.

44.    Also, as set forth below, APHIS's proposed depopulation and disposal methods threaten to violate multiple state and federal laws, including federal laws enacted to protect the environment, such as the Clean Water Act, the Clean Air Act, the Endangered Species Act, and the respective implementing regulations associated with such acts.  Because APHIS failed to adequately evaluate the potential impact of its EAs on these important environmental laws, APHIS's failure to prepare an EIS violates NEPA.  42 U.S.C. § 4332(2)(C).

## VIII.  <u>APHIS Failed To Consider An Adequate Range Of Reasonable Alternatives For Combating HPAI</u>

45.    APHIS's EAs are deficient because they fail to consider a reasonable range of alternative methods for combating HPAI, as required by NEPA.  *Id.*  APHIS was therefore obligated to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."  *Id.* § 4332(2)(E).  Accordingly, CEQ requires that APHIS analyze the possible environmental impacts of a proposed action and weigh available alternatives.  *See* 40 C.F.R. § 1508.9.

46.    Significantly, APHIS failed to meaningfully consider conditioning indemnification on reducing stocking density and shifting to cage-free, low stocking density production as a viable alternative method to control and contain HPAI.

Establishing such conditions would reduce the severity of outbreaks, ensure that more of the animals are treated humanely, cause fewer birds to be killed and disposed of in the event of an outbreak, and mitigate much of the environmental impacts that severely affect the welfare of both humans and wildlife.  Even after HSUS directly proposed a plan involving indemnification conditions and explained its advantages in the comment it submitted to APHIS, the Agency ignored this indemnification proposal and did not address indemnification in the Final EA and FONSI.

47.     Massive poultry raising operations increase the likelihood that an HPAI outbreak will be severe and uncontrollable.[28]  This likelihood increases specifically in caged poultry flocks because "cages can be difficult to disinfect and the housing may harbor breeding populations of rodents and other potential vectors such as flies or littler beetles."[29]  Indeed, even common houseflies can serve as transmitters of HPAI amongst chickens.  As a result, the disease is more likely to mutate and spread: "[a]mplification occurs if the size of the epidemic in humans is increased due to transmission of the influenza into the CAFO species which leads to an epidemic in

---

[28]     *See* Final EA at 77 ("APHIS and the poultry industry agree that the impact of an HPAI outbreak is amplified where poultry production is highly concentrated or networked."); Roberto A. Saenz et al., *Confined Animal Feeding Operations as Amplifiers of Influenza*, 6 VECTOR-BORNE & ZOONOTIC DISEASES 338, 339 (2006) ("The crowding of swine and poultry in CAFOs increases the transmission of influenza viruses.").

[29]     HSUS Comment at 15 (citing a study conducted by the European Food Safety Authority).

COMPLAINT                                          CASE NO. _____

21

the CAFO species, and subsequent transmission back to the local human population."[30]

48.     Poultry factory farm facilities are vented with large fans to maintain specific temperatures.  These same vents emit dust from poultry flocks, which can consist of bedding, feathers, feces, and a high concentration of micro-organisms. When the wind picks up this dust, it can be blown to a nearby facility or community, potentially increasing the transmission of HPAI.

49.     APHIS concedes that airborne transmission of HPAI can occur, particularly in high winds, and studies confirm that HPAI can spread through air.[31]  If HPAI were to mutate and begin infecting humans, airborne emissions could rapidly spread the virus and cause devastating results.[32]  The EAs discuss the use of ventilation systems at poultry facilities, but do not acknowledge them as a potential source of disease transfer.  APHIS failed to consider the implementation of viable measures that encourage a lower bird stocking density, which would result in fewer

---

[30]     Saenz, *supra* note 28, at 339.

[31]     Final EA at 6, 21.

[32]     High-density poultry operations serve as an opportunity and conduit for HPAI, and may increase the chances of HPAI mutating and becoming a massive threat to human health. *See* Michael Greger, *The Human/Animal Interface: Emergence and Resurgence of Zoonotic Infectious Diseases*, 33 CRITICAL REVIEWS IN MICROBIOLOGY 243, 265 (2007), http://www.birdflubook.org/resources/Greger_2007_CRM_33(4)_243.pdf; *see also* Saenz, *supra* note 28, at 338–46

---

COMPLAINT

CASE NO. _____

Case 2:20-cv-03258-AB-GJS   Document 1   Filed 04/08/20   Page 23 of 55   Page ID #:23

airborne particles passing through the system and decrease the threat of spreading HPAI.

50.     In direct violation of NEPA, the Agency neither "rigorously explore[d]" nor "objectively evaluate[d]" structuring indemnification procedures to discourage these dangerous, high-density animal operations as part of a reasonable alternative approach.  40 C.F.R. § 1502.14(a); 42 U.S.C. § 4332(2)(E).  APHIS distributes indemnification payments to producers for birds and eggs that must be destroyed during an outbreak response based on "the fair market value, as determined by the Secretary, of the destroyed animal, article, facility, or means of conveyance."  7 U.S.C. § 8306(d)(2).  However, payments shall not be made when an owner handles an animal "in violation of an agreement for the control and eradication of diseases or pests in violation of this chapter."  *Id.* § 8306(d)(3).  Accordingly, APHIS should have considered implementing indemnification procedures that incentivize producers to stock birds in safer conditions at much lower densities than in current facilities that pose serious risks to both human and environmental health.

51.     As explained above, this alternative would greatly diminish environmental impacts, threats to public health, federal response costs, and inhumane treatment of poultry populations in ways that the preferred and no action alternatives do not.  APHIS was required to assess this reasonable option, especially in light of the comment HSUS submitted that highlighted indemnification as a major component of its recommended alternative proposal.  By disregarding these proposed

indemnification conditions in its EAs and FONSI, APHIS violated NEPA and the APA.

52.     Instead, APHIS's inadequate evaluation considered only two deficient responses to a HPAI crisis.  Under the "no action" alternative, "APHIS would not be involved in HPAI depopulation, transport and disposal of carcasses, and disinfection of equipment and premises."[33]  Nor would APHIS "address the impacts perpetuated by the continued presence and genetic reassortment of AI viruses across the nation."[34]  In contrast, under the preferred alternative, APHIS would use an "Adaptive Management Approach," which purports to control HPAI through surveillance, quarantine, depopulation, carcass management, cleaning and disinfection, and environmental sampling.  However, the Adaptive Management Approach entails disposing of poultry carcasses using problematic methods such as VSD, landfilling, rendering, incineration, composting, and mass-burial.[35]  The assessment of these approaches in the EAs fails to show that the methods used to kill and dispose of infected birds will not have a significant impact on human health and the environment.

53.     It is not enough to study only the "no-action" and "preferred" alternatives.  In the alternatives analyses, the EAs must "provide sufficient evidence

---

[33]     Final EA at 19.

[34]     *Id.* at 25.

[35]     *Id.* at 74–76.

and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact."  40 C.F.R. § 1508.9(a)(1).  Because the EAs considered only two options for combatting HPAI, their analyses are insufficient to satisfy the basic requirements of NEPA.  *See Nat'l Hwy. Traffic Safety Admin.*, 538 F.3d at 1218, 1224–27 (holding that NHTSA violated NEPA by preparing an inadequate EA that "considered a very narrow range of alternatives.").

54.     Both EAs fail to consider the likelihood that hazardous methods of depopulation and carcass management, such as VSD, unlined burial, and incineration, will be utilized, and also fail to consider a range of reasonable, safer, and more humane alternatives.  One such alternative is a nitrogen filled foam-based euthanasia method developed in 2006 and commonly used in Europe.  Unlike water-based foams, the gases in this foam render birds unconscious before they suffocate.

55.     Moreover, by only considering no action and its Adaptive Management Approach, APHIS disregarded the possibility of implementing tighter restrictions to ensure that one of the most dangerous forms of disposal—unlined burial—is never used.

56.     As previously discussed, the use of unlined burial pits for the mass-disposal of bird carcasses may contaminate nearby water sources, and the likelihood of such pollution increases as the number of carcasses increases.  The use of unlined burial pits may also "release gases associated with anaerobic decomposition, such as carbon dioxide, carbon monoxide, nitrogen oxides, sulfur dioxide, hydrogen chloride

and fluoride, and methane."[36]  Additionally, unlined burial pits and the heavy machines used to dig trenches and remove topsoil to create such pits "*will* impact the physical properties of soil," including "increased erosion during and after burial activities have occurred."[37]

57.    Unlined mass-burial may also cause serious harm to humans.  "Public health impacts associated with unlined burial arise from potential exposure to pathogens and decomposition chemicals released into the environment, including surface and ground waters. . . . Unlined burial releases high concentrations of ammonia, organic acids, and gases (e.g., carbon dioxide or methane) . . . which may be toxic to humans."[38]

58.    Further, as detailed by APHIS in the December 2015 Carcass Management EIS, "[u]nlined burial and open-air burning of carcasses during a mass animal health emergency are expected to have the greatest impacts to the environment, particularly when carcasses are contaminated with biological, chemical, and/or radiological agents not naturally found in animal carcasses."[39]  HPAI would qualify as such an agent.  The same EIS also noted that "current environmental conditions at carcass management sites could already be compromised, and this

---

[36]    Final EA at 27.

[37]    *Id.* at 28–30.

[38]    *Id.* at 34.

[39]    Carcass Management EIS at vi–vii.

should be considered in context of any potential for additional impacts from managing carcasses."[40]

59.    In light of these hazardous effects and the "variety of [other] methods for disposal of poultry carcasses,"[41] APHIS was required to consider and analyze a response plan that eliminated unlined burial as a potential method of carcass disposal. Instead, APHIS simply notes "[i]f unlined burial is considered for use at a site, APHIS guidance recommends a site-specific investigation be performed prior to selecting this disposal method to avoid groundwater impacts."[42]  The EA is therefore inadequate because it fails to examine a viable alternative in which unlined burial is never used due to the substantial dangers it poses to humans, animals, and the environment.

## IX.    APHIS's Proposed Actions Threatened, And Continue To Threaten Violations Of Federal And State Laws

60.    As noted above, in determining whether to prepare an EIS, APHIS was required to assess "[w]hether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment," and "[t]he degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species

---

[40]    *Id.* at 131.

[41]    Final EA at 75.

[42]    *Id.* at 79.

Act of 1973."  40 C.F.R. § 1508.27(9)–(10).  APHIS's proposed depopulation and disposal practices threaten violations of the CWA, CAA, ESA, MBTA, Bald and Golden Eagle Protection Acts, and various state laws, and APHIS failed to adequately evaluate these threats in its EAs.  These potential violations are another reason APHIS's failure to prepare an EIS violates NEPA.  42 U.S.C. § 4332(2)(C).

### A.    Threatened Violations Of The Clean Water Act

61.    Historically, small independent farms raised poultry in the U.S. However, over the last few decades, many of these farms have been replaced by CAFOs, which are large-scale industrial agricultural facilities that raise a large number of animals for human consumption in closely confined areas.

62.    Although APHIS recognizes that "every improperly managed poultry carcass could become a point source of water pollution,"[43] the EAs do not mention that *all* CAFOs are intended to be regulated as "point sources" under the CWA.  *See* 33 U.S.C. § 1362(14).  Nor do the EAs mention that many CAFOs fail to operate with even a basic CWA permit, or that many farming operations fall slightly outside the parameters of the specific, statutory definition of "CAFO,"[44] meaning that innumerable point sources may not be counted or regulated as CAFOs.

---

[43]    Final EA at 20.

[44]    *See* EPA, CAFO CONSOLIDATED FINAL RULES (2008), https://www.epa.gov/sites /production/files/2015-08/documents/cafo_final_rule2008_comp.pdf.

63.    APHIS also fails to identify how many of the thousands of farms that have been or may be impacted by HPAI outbreaks are CAFOs.  In 2011, the EPA estimated that there were over 24,000 CAFOs in the U.S., several thousand of which confine birds.[45]

64.    The risk to water quality from the disposal of hundreds of thousands of poultry carcasses nationwide, statewide, and locally—especially by CAFO facilities—is astronomic, and should have been more fully analyzed by APHIS in advance of finalizing its national approach to HPAI, as required by NEPA.

65.    Specifically, during carcass decay, contaminants such as ammonia-nitrogen, phosphorous, and chloride may leach into groundwater, while waste can carry pathogens.[46]  Drugs given to birds may also leach into the soil and groundwater, as evidenced by the "[e]levated levels of phosphorus, nitrogen, chloride, antibiotics, hormones, and veterinary pharmaceuticals [that] have been observed in soils surrounding unlined burial pits."[47]  Additionally, poultry by-products and waste can contain pathogens that contaminate water sources, and the Avian Influenza virus can

---

[45]    *See* EPA, SUPPORTING STATEMENT FOR THE INFORMATION COLLECTION REQUEST FOR REVISIONS TO NPDES RULES FOR CONCENTRATED ANIMAL FEEDING OPERATIONS—PROPOSED 308 RULE, EPA-HQ-OW-2011-0188-0055, at 9 (2011).

[46]    Final EA at 28.

[47]    *Id.* at 30.

COMPLAINT                                    CASE NO. _____

29

survive in bird fecal material and may remain infectious for extended durations depending on water temperature.[48]

66.    APHIS's EAs fail to identify which drugs and compounds are commonly administered to poultry, and they fail to address the potential impact of burying several hundreds of thousands of birds containing harmful drugs together in unlined pits.

67.    The EAs also fail to consider that the use of pharmaceuticals in poultry flocks increases when producers fear an outbreak of infection, and when signs of illness first appear.  For instance, poultry producers outside of the U.S. have unlawfully used antiviral drugs to try to stop the outbreak of Avian Influenza, with serious human consequences.

68.    These drugs and other compounds, together with leachates[49] from thousands of animals decomposing in unlined burial pits, threaten to cause water pollution and violate the CWA.  Although the EAs cursorily acknowledge this risk, APHIS nevertheless fails to set forth even the most basic information about the types and amounts of pharmaceutical leachates and their proximity to surface and groundwater in different regions of the country.  40 C.F.R. § 1508.27(a) ("the

---

[48]    *Id.* at 20, 28

[49]    Leachate is the liquid that is formed when water comes into contact with decomposing waste and biomass, including bodily fluids that leak from dead animals.  Final EA at 6.

significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region . . . and the locality.").  Thus, the EAs are missing critical information essential to an adequate assessment of environmental impacts at the local, state, or national level.

69.    APHIS attempted to explain this critical failure by simply noting, "[i]f unlined burial is considered for use at a site, APHIS guidance recommends a site-specific investigation be performed prior to selecting this disposal method."[50] However, NEPA requires more.  Specifically, such "environmental information [must be] available to public officials and citizens *before* decisions are made and *before* actions are taken."  40 C.F.R. § 1500.1(b) (emphasis added).  Moreover, given the necessity of responding quickly and rapidly disposing of carcasses, conducting site-specific EAs or EIS's for each HPAI outbreak while trying to contain it is impractical.

70.    Moreover, after listing several other potential impacts on water quality parameters, such as pH, conductivity, biological oxygen demand, nutrient loading from phosphorus and nitrogen, and decreasing dissolved oxygen, APHIS explicitly states that "the potential for impacts to water quality rises as the number of carcasses increases."[51]  Again, however, the EA does not meaningfully analyze such increased

[50]    Final EA at 79.

[51]    Final EA at 28.

risk, especially as it relates to carcass disposal, facility restocking, or the lack of facility CWA permitting.

### B.    Threatened Violations Of State Clean Water Laws

71.    For the same reasons, the actions outlined in the EAs also threaten violations of the robust body of state laws that protect surface and groundwater from pollution, some of which are even broader in scope than the CWA.  These laws affect both small farms and CAFOs, and may protect groundwater even absent a connection to surface water.

72.    For instance, California strongly protects against groundwater pollution, and the state's Sustainable Groundwater Management Act establishes Groundwater Sustainability Agencies, sustainability plans, and state evaluation and assessments. CA WATER § 10720 *et seq*.  California's Water Law reflects the public's "primary interest in the conservation, control, and utilization of the water resources of the state," and intends to advance that interest by ensuring the protection of the "quality of all the waters of the state," including "any surface water or groundwater . . . within the boundaries of the state," "for the public's use and enjoyment."  *Id*. §§ 13000, 13050; *Tesoro Refining & Mktg. Co. LLC v. L.A. Regl. Water Quality Control Bd*., 255 Cal. Rptr. 3d 343, 347 (Cal. Ct. App. 2019).  Likewise, Minnesota—one of the "top five turkey production states"[52]—has enacted a regulation imposing, whenever

---

[52]    Final EA at 13.

practical, a statewide goal of maintaining groundwater "free from any degradation caused by human activities." MINN. STAT. ANN. § 103H.001 (West 2018).  Similarly, South Dakota has declared that "pollution of groundwater . . . constitutes a menace to public health, welfare and the environment," and has enacted an extensive set of regulations that effectuate the state's public policy "to conserve the groundwaters of the state and to protect, maintain and improve the quality thereof for present and future beneficial uses through the prevention of pollution, correction of groundwater pollution problems and close control of limited degradation perimeters permitted for necessary economic or social development."  S.D. CODIFIED LAWS § 34A-2-104; S.D. ADMIN. R. 74:54:01–02.

### C. Threatened Violations Of The Clean Air Act

73.     APHIS has recognized that various carcass disposal processes contemplated in its EAs may have significant detrimental impacts on air quality.  In its December 2015 Carcass Management EIS, APHIS acknowledges that the unlined burial disposal method can cause harmful gases from contaminated carcasses to build up and vent through the soil during decomposition.  Released gases can harm plant growth and contaminate air in the surrounding areas, sometimes causing pathogens from infected birds to be discharged into the atmosphere.  These gases can also accumulate in enclosed underground spaces and cause explosion hazards.[53]

---

[53]     Carcass Management EIS at 76–77.

74.    APHIS has also recognized that the open-air burning disposal method similarly threatens air quality by dispersing odor, smoke, pathogens, and other pollutants into the atmosphere, and "[t]here are additional potential impacts to air when the carcasses are contaminated with biological, chemical, and/or radiological agents."[54]

75.    Even the alternative procedures recommended in APHIS's Carcass Management EIS pose potential hazards to air quality, including disposal in rendering facilities, fixed-facility incineration, composting, and landfills.  Despite more controlled environments and reduced risks from these methods, the threat of harmful pollutant emissions is still present.[55]  Both Riverside and San Bernardino County, which collectively have millions of factory-farmed egg laying hens, received an F in the 2019 American Lung Association State of the Air Report.[56]  Burning thousands of birds in or near counties like these can push air quality from bad to dangerously bad.

76.    Accordingly, the actions outlined in the EAs threaten multiple violations of the CAA.  The risk to air quality at the local, state, and national level from the disposal of tens of millions of poultry carcasses nationwide, especially through methods such as incineration, is troubling and should have been more fully analyzed

---

[54]    *Id.* at 78.

[55]    *Id.* at 79–80.

[56]    *State of the Air Report Card: California*, AMERICAN LUNG ASSOCIATION, http://www.stateoftheair.org/city-rankings/states/california/ (last visited Apr. 6, 2020).

COMPLAINT                                                        CASE NO. _____

by APHIS.  40 C.F.R. § 1508.27(a) ("the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region . . . and the locality.").

77.     The EAs provide that "[a]ir emissions from rendering, fixed-facility, incineration, and landfilling are regulated through a Federal or State permitting process to minimize releases[,]" and that these disposal methods "are effective at containing pollutants associated with carcasses."[57]  APHIS arrives at this conclusion without citing any study or fact showing that these permitting processes can be safe and environmentally sound when operated at the scale of a major HPAI outbreak, despite acknowledging that such emissions "can impact human health."[58]

78.     Similarly, APHIS fails to make clear whether states are permitted to use open incineration under the program.  By merely stating that air emissions from incineration are subject to "Federal or State permitting process[es] to minimize releases[,]" APHIS does not ensure that open burning will not be used to dispose of large quantities of affected birds.[59]  In an article published by the EPA entitled *Carcass Management During Avian Influenza Outbreaks*, the EPA makes its position clear that incineration, including the use of open pyres, is an "option" for handling diseased poultry carcasses, despite also recognizing that some incineration methods

---

[57]     Final EA at 27.

[58]     *Id.*

[59]     *Id.* at 10, 27.

have a detrimental impact on human health and the environment.[60]  For example, the

EPA has acknowledged that open pyres "may pose risks to human health and the

environment."[61]  In spite of this, APHIS did nothing to limit the use of incineration

methods that it clearly knew to be dangerous, and incineration was used to dispose of

poultry carcasses infected during the 2015 HPAI outbreak.  Given that even regulated

incineration may release ash, particulate matter, dioxins, polyaromatic hydrocarbons,

and metals, APHIS has been reckless in allowing open incineration and the

uncontrolled harmful effects it produces.  Furthermore, the groundwater and soil

contamination that results from open-air burning poses additional clean-up

challenges.

79.     Pre-existing state or federal regulation of an industry cannot act as a

substitute for the required "hard look" under NEPA.  If it were otherwise, NEPA

would be rendered meaningless, as most industries are subject to federal and/or state

regulation.  Accordingly, hoped-for compliance with other environmental laws is not

a legally sufficient justification for failing to meet the requirements of NEPA.

**D.     Threatened Violations Of The Endangered Species Act, Migratory Bird Treaty Act, And Bald And Golden Eagle Protection Act**

---

[60]     *Carcass Management During Avian Influenza Outbreaks*, EPA, https://www.epa.gov/homeland-security-waste/carcass-management-during-avian-influenza-outbreaks (last visited Apr. 6, 2020).

[61]     *Id.*

80.     Birds listed under the ESA, MBTA, and Bald and Golden Eagle Protection Acts are all at risk of contracting HPAI when they can access carcasses of infected birds.[62]  Indeed, bald eagles are among the wild birds listed in the Final EA as having tested positive for HPAI during the 2014 to 2015 period.[63]

81.     APHIS claims that it is "most likely that [ESA] listed birds would be exposed to HPAI from wild, migratory birds as the viruses circulate in the flyways . . . and the proposed program targets only domestic poultry.  Thus, the proposed action may be of limited benefit to federally listed birds."[64]  However, the issue is not whether the action would "benefit" the birds protected under these statutes; it is whether any "takings"[65] of these protected species, or disturbances to their critical habitats, will *definitely not* result from the proposed program.  *See* 16 U.S.C. § 1538.

82.     Particularly troublesome is APHIS's conclusion that "[a]lthough it is possible that [federally] listed scavenging species or bird species could enter barns where carcasses are held prior to composting, there is a great deal of human activity

---

[62]    Final EA at 39 ("All bird species federally listed as threatened or endangered in the United States may be susceptible to infection by HPAI[.]").

[63]    *Id*. at 36.

[64]    *Id.* at 39–40.

[65]    The term "take" in this context "means to harass, harm, pursue, hunt, shoot, wound, kill trap, capture, or collect, or attempt to engage is such conduct." 16 USC § 1532(19).

around commercial poultry facilities, and these species would avoid such areas."[66] This incorrectly assumes that there will *always* be significant activity around *all* piles of decaying carcasses, which is a baseless conclusion.  APHIS also incorrectly assumes that these carcasses will always be held inside and fails to provide any explanation for drawing such an erroneous conclusion.  Wild birds can easily access any carcasses that are left outside or unattended inside open facilities.

83.    In any event, the fact that federally listed birds could likely access piles of infected carcasses suggests that the detrimental impact of the HPAI depopulation and disposal methods could be significant on these protected birds, especially considering the speed with which HPAI can spread in the wild and the almost certain fatality of the disease to threatened and endangered species.

84.    Moreover, APHIS claims that "landfilled and buried carcasses are covered with several feet of soil or other material, soon after placement, and that composted carcasses are covered with 8 to 12 inches of clean material such as wood chips."[67]  However, APHIS fails to set out any timeframe within which this covering would need to occur, even though any amount of time that carcasses are left uncovered is a threat to endangered avian species.

[66]    Final EA at 40.

[67]    *Id.* at 41.

85.     Finally, as mentioned above, the pharmaceuticals used in poultry rearing pose an entirely separate set of problems for protected species.  When certain disposal practices—including burial and incineration—are employed, the drugs used in these processes can enter the environment and linger there for extended periods of time. APHIS's EAs failed to analyze *any* of the potentially serious impacts on endangered plant and animal species from *any* of the many pharmaceuticals regularly used on poultry throughout the industrial farming industry.  Additionally, neither EA discussed the increase in drugs routinely given to confined birds during disease outbreaks or the detrimental effects posed by the accrual of such drugs in the environment.

## X.     APHIS Improperly Postponed Analyzing The Local Consequences Of The Proposed Action

86.     APHIS also violated NEPA by failing to analyze local environmental impacts in its EAs.  APHIS was required by NEPA to take a "hard look" at the consequences, environmental impacts, and adverse effects of any proposed federal action.  *Nat'l Hwy. Traffic Safety Admin.*, 538 F.3d at 1194; *see also* 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.9.  APHIS's decision to forego such analyses runs counter to the well-established notion that "NEPA is not designed to postpone analysis of an environmental consequence to the last possible moment.  Rather, it is designed to require such analysis *as soon as it can reasonably be done*."  *Kern v. United States BLM*, 284 F.3d 1062, 1072 (9th Cir. 2002) (emphasis added).

87.     As detailed above, the actions proposed in APHIS's EAs threaten to have significant local impacts.  However, despite requirements to do so under NEPA, APHIS's EAs did not address any local environmental conditions at the regional, state or local level.  *See* 40 C.F.R. § 1508.27 ("[I]n the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole.").  While APHIS recognized the existence of divergent regional and local regulations and broadly claimed that it would "evaluate disposal options based on . . . local conditions[,]"[68] it nonetheless proposed a system in which local impacts are inevitably addressed at the last possible moment—*i.e.*, only *after* HPAI has been detected in a specific area and, in all likelihood, after potentially harmful depopulation and disposal methods have been employed.  Moreover, because the Agency must respond rapidly to stop the spread of disease, ad hoc thoughtful environmental review of local impacts is unlikely to be adequately undertaken.

88.     In the EAs, APHIS failed to consider that even seemingly minor environmental differences among localities can lead to similar depopulation and disposal methods producing drastically different results and environmental impacts. Even though there is variability at the local level, APHIS could have addressed these differences in its EAs.  For instance, the depth of groundwater in a particular locality should inform the types of disposal methods that APHIS allows.  Because these

---

[68]     Final EA at 7, App'x A.

decisions must be made promptly when responding to HPAI, APHIS should have specified which modes of depopulation and carcass disposal are acceptable based on varying conditions in different regions and localities.  This type of analysis likely cannot be adequately performed immediately before or during an outbreak crisis, as the need to respond in short order does not allow time for thorough environmental review.

## XI.    APHIS's EAs Failed To Consider The Most Likely Scenarios

89.    Although APHIS describes various methods of depopulation and carcass disposal in its EAs, it does not properly address the likelihood that the "preferred" methods will be the ones that are actually carried out.

90.    For instance, the EAs assert that "the use of water-based foam and carbon dioxide are preferred [depopulation] methods during HPAI outbreaks."[69] Additionally, as a result of comprehensive studies, animal scientists have presented high expansion gas-foam filled with nitrogen or carbon dioxide as a viable and more humane form of depopulation.  Yet the EAs also provide that when these methods "cannot be deployed within 24 hours," the dangerous practice of ventilation shutdown "may be applied under limited circumstances."[70]  According to APHIS, VSD is "infrequently used," and this method is selected "on a case-by-case basis."[71]

---

[69]    *Id.* at 75.

[70]    *Id.* at 10.

[71]    *Id.* at 28.

91.     However, APHIS's proposed depopulation strategy is not realistic in practice.  Indeed, when analyzing the effectiveness of APHIS's "preferred" methods on controlling HPAI outbreaks, the USDA concluded:

More than one method of depopulation is likely to be required in an HPAI outbreak; carbon dioxide ($CO_2$) and water-based foam have been the most commonly implemented methods during the current outbreak. However, at the height of outbreak detections, these methods were **insufficient for rapid depopulation and disposal, and could not be executed quickly enough to halt the production of HPAI** virus in infected flocks.  As such, APHIS, State, and industry stakeholders acknowledged that other rapid depopulation methods must be considered if HPAI re-emerges in the fall.[72]

The USDA therefore reasoned that "rapid stamping-out" of the infected birds (within 24 hours) was "needed to prevent continued virus shedding and further amplification of HPAI."[73]  According to the USDA, under these circumstances VSD is "a necessary alternative" to APHIS's "preferred" methods,[74] meaning that operators are effectively

---

[72]   *HPAI Outbreak 2014-2015: Ventilation Shutdown Evidence & Policy*, USDA (Sept. 18, 2015), https://www.aphis.usda.gov/animal_health/emergency_ management/downloads/hpai/ventilationshutdownpolicy.pdf (emphasis added).

[73]   *Id.* at 1.

[74]   *Id.* at 2 ("The need to control and eradicate HPAI . . . makes VSD a necessary alternative").

COMPLAINT

CASE NO. _____

forced to shut down facility ventilation systems until the birds suffocate and are slowly cooked to death.

92.     APHIS's claim that $CO_2$ and water-based foam are the preferred depopulation methods, and that these methods will achieve the Agency's purpose, cannot be reconciled with the USDA's claim that these very methods are inadequate. This is especially true given that other effective and more humane methods exist, such as high expansion nitrogen filled foam.  Indeed, the EAs do not even treat VSD as a *likely* outcome in lieu of the use of $CO_2$ or water-based foams, let alone a *necessary* one.  Even under the allegedly "limited" circumstances when VSD is intended to be used, VSD *still* poses a threat to human physical safety, especially to persons tasked with removing dead birds from their cages.[75]  Moreover, in addition to the substantial pain and suffering that VSD inflicts on birds, the process may not ultimately kill all of the birds, meaning that other methods may still be required.

93.     Because APHIS only considered the effects of using VSD "under limited circumstances,"[76] the EAs are deficient.  APHIS therefore violated NEPA by failing to analyze the direct, indirect, or cumulative effects of using VSD as a primary killing method.

---

[75]     Final EA at 32 ("The ventilation shutdown method . . . may result in elevated levels of ammonia" that pose a threat to workers involved in depopulation efforts.).

[76]     *Id.* at 10.

COMPLAINT                                                          CASE NO. _____

## XII.   **APHIS Failed To Adequately Consider Environmental Justice Issues**

94.     Executive Order 12898 requires that federal agencies identify and address "disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations."  Exec. Order No. 12898, § 1-101 (Feb. 11, 1994).

95.     Significantly, although the Executive Order does not create a new right to judicial review, a United States District Court in the Central District of California has found that when an agency chooses to consider environmental justice in its analysis (as is required by the Order and as APHIS has done here), that analysis is reviewable under both NEPA and the APA's arbitrary and capricious standard.  *See Crenshaw Subway Coal. v. L.A. Metro. Trans. Auth.*, 2015 WL 6150847, at *29 (C.D. CA Sept. 23, 2015).  Other courts have similarly held that an environmental justice analysis is reviewable under these circumstances.  *See Cmtys. Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678, 689 (D.C. Cir. 2004) (holding that when an agency "exercise[s] its discretion to include the environmental justice analysis in its NEPA evaluation," an environmental justice claim "is properly before this court because it arises under NEPA and the APA" rather than under Executive Order 12898); *Coliseum Square Ass'n, Inc. v. Jackson*, 465 F.3d 215, 232 (5th Cir. 2006), *cert denied*, 552 U.S. 810 (2007) (holding an environmental justice study contained in a NEPA analysis was subject to arbitrary and capricious review).

96.     In the EAs, APHIS stated that "[a]ffected poultry production operations are likely to be in rural areas," but concluded, without further explanation or factual support, that there was "no way to determine in advance how many will be among the rural poor."[77]  Accordingly, APHIS simply adopts yet another wait-and-see approach, under which it proposes to "address minority and low-income population concerns expressed by individuals as they arise."[78]  However, there is no realistic possibility that APHIS will have time to conduct such a review in the middle of an outbreak.

97.     This unsupported conclusion is troubling.  The USDA is the nation's leading agency responsible for developing, implementing, and analyzing agricultural programs.  When it declares a lack of knowledge regarding the impact that its actions will have on minority populations, this is a cause for citizen concern.

98.     APHIS's purported inability to determine the effects of its action on low-income populations is also contradicted by the USDA's own statistical information about the location of poultry operations nationwide.[79]  Additionally, according to the most recent agricultural census, the USDA even took "special efforts" and

---

[77]     Final EA at 38.

[78]     *Id*.

[79]     *See EJSCREEN:  Environmental Justice Screening and Mapping Tool*, EPA, https://www.epa.gov/ejscreen (last visited April 6, 2020).

"implemented several activities to improve coverage" of socially disadvantaged and minority farm operators.[80]

99.     The correlation between race, income, and exposure to hazardous waste disposal is well documented.  CAFOs are typically located in disenfranchised communities that have limited access to healthcare and, due to community members' close proximity to waste disposal sites and the contamination caused thereby, the disenfranchised are likely to bear the brunt of the harm stemming from inadequate carcass disposal methods.  Research has shown that the waste, pathogens, heavy metals, and odor produced by CAFOs contribute to excessive respiratory and digestive ailments, mood disorders, impaired mental health, and decreased quality of life for the low-income community members living nearby such operations.  These adverse health impacts are only exacerbated when inadequate carcass disposal methods are used to cull large populations of diseased poultry.

100.   In January 2017, the EPA issued a letter to the North Carolina Department of Environmental Quality expressing "deep concern about the possibility that African Americans, Latinos, and Native Americans have been subjected to discrimination as the result of NC DEQ's operation of the Swine Waste General

---

[80]     *See* USDA, 2012 CENSUS OF AGRICULTURE, at IX, App'x A-1–A-6 (2014), https://www.agcensus.usda.gov/Publications/2012/Full_Report/Volume_1,_Chapter_2_US_State_Level/st99_2_001_001.pdf.

Permit program, including the 2014 renewal of the Swine Waste General Permit."[81]

This reflects the EPA's acknowledgement that factory farm waste disposal

disproportionally impacts minority communities.

101.   It is exceptionally troubling that APHIS's environmental justice

conclusions make no attempt to measure the impact on minority populations.  In the

Final EA, APHIS simply notes that it would be "speculative" to determine when

impacts may occur, what APHIS could do to reduce any potential impacts, and the

extent to which "minority populations 'off of the farm' may be impacted by a

particular outbreak."[82]  This rationale is belied by the existence of relevant

environmental justice information as noted above, and is plainly insufficient to satisfy

NEPA, which requires either an analysis of likely impacts or a determination that the

impacts are unlikely.

102.   The deficient analysis in APHIS's EA also directly conflicts with the

conclusion that APHIS makes in its corresponding FONSI.  In the FONSI, Defendant

Dr. Burke Healy addresses this important issue in a single sentence that states:  "the

preferred alternative poses no disproportionate adverse effects to minority and low-

---

[81]   Letter from Lilian S. Dorka, US EPA, to William G. Ross, Jr., NC Dept. of
Enviro. Quality (Jan, 12, 2017),
https://www.epa.gov/sites/production/files/2018-
05/documents/letter_of_concern_to_william_g_ross_nc_deq_re_admin_compl
aint_11r-14-r4_.pdf.

[82]   Final EA at 79.

income populations[.]"[83]   However, the FONSI cites no evidence to support this

conclusory determination, and it contradicts APHIS's assertion in the EA that there

was "no way to determine" any such impacts in advance.[84]   Defendant Healy lacked a

factual basis for this conclusion, and any adequate consideration of available

information would have compelled APHIS to conduct a more thorough

environmental justice analysis.

## XIII.  APHIS's Preparation Of The Carcass Management EIS Further Demonstrates The Need For A HPAI-Specific EIS

103.   In December 2015—nearly simultaneous to the release of the Final

EA—APHIS also released its lengthy Carcass Management EIS, which "analyzes the

environmental effects associated with various carcass management alternatives that

could be implemented during a mass animal health emergency."[85]   The Carcass

Management EIS details various "improved carcass management options," including

"landfill, rendering, incineration, composting, and non-standard methods, rather than

the traditional options of unlined burial and open-air burning."[86]   The fact that APHIS

considered substitutes in the Carcass Management EIS for the dangerous practices

---

[83]      FONSI at 1.

[84]      Final EA at 38.

[85]      Carcass Management EIS at v.

[86]      *Id*. at 2.

***that are permissible under the preferred approach in the Final EA*** further

demonstrates the existence of these viable but unexamined alternatives.

104.   More generally, if carcass management itself requires an EIS, then it

follows that a depopulation and disposal program incorporating carcass management

must also warrant an EIS.  Although APHIS attempts to use the Carcass Management

EIS as a substitute for an HPAI-specific EIS,[87] agencies cannot avoid preparing an

EIS by segmenting action.  *See Nat'l Audubon Soc'y v. Butler*, 160 F. Supp. 2d 1180,

1189 (W.D. Wash. 2001); 40 C.F.R. § 1508.27(b)(7).

105.   NEPA requires that an EIS accompany "*every* recommendation or report

on proposals for . . . major Federal actions significantly affecting the quality of the

human environment." 42 U.S.C. § 4332(2)(C) (emphasis added).

106.   An EIS was necessary because the HPAI outbreak control activities

proposed in the EAs may significantly affect the human environment.  HPAI has

virulently spread across the country in recent years, threatening human health, animal

welfare, and the environment, and leaving tens of millions of dead birds in its wake.

In a comparable situation that dealt exclusively with carcass disposal, APHIS

explicitly acknowledged that NEPA demands the comprehensive consideration of an

EIS.[88]  The Agency has not explained—and cannot explain—how one subset of a

---

[87]     *See* Final EA at 77.

[88]     *See* Carcass Management EIS.

COMPLAINT                                          CASE NO. _____

problem (carcass disposal) warrants an EIS, yet the problem as a whole (killing millions of animals, disinfecting massive facilities, and carcass disposal) somehow does not have a significant impact on the human environment.

**CLAIMS FOR RELIEF**

**Claim One:  The USDA Violated NEPA By Failing To Evaluate A Reasonable Range Of Alternative Actions.**

107.   The allegations of all prior paragraphs are incorporated by reference.

108.   APHIS violated NEPA by failing to undertake a thorough and objective evaluation of a reasonable range of alternative actions in the July 2015 EA, the Final EA, and the FONSI.  This claim is brought pursuant to the judicial review provision of the APA, 5 U.S.C. § 706(2).

109.   NEPA requires all federal agencies to undertake a thorough and public analysis of the environmental consequences of proposed federal actions, including a reasonable range of alternative actions.

110.   APHIS's EAs and FONSI violate NEPA and APA in failing to rigorously explore and objectively evaluate all reasonable alternatives.

111.   For the foregoing reasons, APHIS's preparation and approval of the EAs and the FONSI is arbitrary, capricious, an abuse of discretion, and not in accordance with law under NEPA and the APA.

**Claim Two:  The USDA Violated NEPA And The APA By Approving Arbitrary And Capricious Environmental Assessments And The FONSI.**

112.   The allegations of all prior paragraphs are incorporated by reference.

113.   APHIS violated NEPA by failing to undertake a thorough and objective "hard look" at the environmental impacts of its activities proposed in the July 2015 EA, the Final EA, and the FONSI.  This claim is brought pursuant to the judicial review provision of the APA, 5 U.S.C. § 706(2).

114.   NEPA requires all federal agencies to undertake a thorough and public analysis of the environmental consequences of proposed federal actions, including:  a description of baseline conditions; a reasonable range of alternative actions, including a "no action" alternative; and a thorough evaluation of the direct, indirect, and cumulative impacts of proposed actions.

115.   APHIS's EAs and FONSI violate NEPA and APA in the following ways, each of which is a distinct and separate violation of law:

(a)   APHIS improperly segmented its analysis;

(b)   APHIS failed to take a "hard look" at the direct, indirect, and cumulative impacts of the most likely scenarios that will result from the proposed action; and

(c)   APHIS failed to adequately consider environmental justice issues.

116.   For the foregoing reasons, APHIS's preparation and approval of the EAs and the FONSI is arbitrary, capricious, an abuse of discretion, and not in accordance with law under NEPA and the APA.

**Claim Three:  The USDA Violated NEPA By Failing To Prepare An EIS On The Proposed Action.**

117.   The allegations of all prior paragraphs are incorporated by reference.

118.   APHIS violated NEPA by refusing to prepare a NEPA-compliant EIS for its HPAI outbreak control activities, notwithstanding available information showing these activities may have a significant adverse effect on the human environment.

119.   APHIS's HPAI outbreak control activities may have a significant effect on the human environment for reasons including but not limited to the following:

(a)   APHIS's activities encompass an immensely broad geographic area:  the entire United States;

(b)   The proposed action threatens violations of the CWA, CAA, ESA, MBTA, and Bald and Golden Eagle Protection Act, and various state laws;

(c)   The proposed action may adversely affect endangered or threatened species and habitats that have been determined to be critical under the ESA;

(d)   The proposed action improperly postpones analyses of its local environmental impacts until the last possible moment;

(e)   It is reasonable to anticipate that the proposed action will have a cumulatively significant impact on the environment; and

(f)     APHIS improperly segmented its analysis by preparing an EIS for only one portion of the proposed action, carcass management, as a substitute for an assessment of the entirety of the proposed action's impact.

120.   The decision not to prepare an EIS was therefore arbitrary and capricious, an abuse of discretion, not in accordance with NEPA, 42 U.S.C. § 4332, 40 C.F.R. § 1502.9(c), and must be set aside. 5 U.S.C. §§ 701–706.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court:

A.     Order, adjudge, and declare that APHIS violated NEPA, NEPA's implementing regulations and policies, and the APA by refusing to prepare an EIS analyzing the full range of its HPAI outbreak control activities;

B.     Order, adjudge, and declare that APHIS violated NEPA, NEPA's implementing regulations and policies, and/or the APA in approving the EAs and FONSI without taking the required NEPA "hard look" at actions, alternatives, and environmental impacts;

C.     Reverse, vacate and set aside the EAs and FONSI;

D.     Order APHIS to prepare an EIS that satisfies the requirements of NEPA; and

1        F.     Grant such further and other relief as the Court deems just and proper to

2  remedy Defendants' violations of law and protect the wildlife and people of the

3  United States.

Dated:    April 8, 2020

Respectfully submitted,

**SHEARMAN & STERLING LLP**

By:   /s/ John Gueli
John Gueli
Adam Schwartz (*pro hac vice*
application forthcoming)
Sam Jolly (*pro hac vice* application
forthcoming)
Elizabeth Robinson (*pro hac vice*
application forthcoming)
Daniel Wiener (*pro hac vice*
application forthcoming)
Sophia Zander (*pro hac vice*
application forthcoming)
599 Lexington Avenue
New York, NY 10022-6069
(212) 848-4000
jgueli@shearman.com
adam.schwartz@shearman.com
sam.jolly@shearman.com
liz.robinson@shearman.com
daniel.wiener@shearman.com
sophia.zander@shearman.com

**THE HUMANE SOCIETY OF THE
UNITED STATES**

By:   /s/ Peter Brandt
Peter Brandt
Laura J. Fox (*pro hac vice*
application forthcoming)
1255 23rd Street, NW, Suite 450
Washington, DC 20037
(202) 452-1100
pbrandt@humanesociety.org
lfox@humanesociety.org

*Attorneys for Plaintiff Humane
Society of the United States*