John Gueli (Bar No. 171914)
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY 10022-6069
Telephone:  (212) 848-4000
Email:  jgueli@shearman.com

Peter Brandt (Bar No. 241287)
THE HUMANE SOCIETY OF THE
UNITED STATES
1255 23rd Street, NW, Suite 450
Washington, DC 20037
Telephone:  (202) 452-1100
Email:  pbrandt@humanesociety.org

*Attorneys for Plaintiffs, The Humane
Society of the United States, Mercy For
Animals, and Farm Sanctuary*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| THE HUMANE SOCIETY OF THE UNITED STATES, MERCY FOR ANIMALS, FARM SANCTUARY, | Case No. 2:20-CV-03258-AB-GJS |
| Plaintiffs, | **FIRST AMENDED COMPLAINT** |
| v. | |
| UNITED STATES DEPARTMENT OF AGRICULTURE, ANIMAL AND PLANT HEALTH INSPECTION SERVICE, VETERINARY SERVICES, KEVIN SHEA, BURKE HEALY, MARK DAVIDSON, | |
| Defendants. | |

# INTRODUCTION

1.      Industrialized poultry facilities are ideally suited for influenza viruses to multiply and mutate into catastrophically contagious and deadly forms.  Avian Influenza, commonly known as bird flu, is a virus with multiple strains that causes varying degrees of clinical illness in chickens, other animals, and humans.  Highly pathogenic Avian Influenza ("HPAI") is an extremely infectious and fatal form of the virus that spreads rapidly within and between flocks or herds and can disastrously affect humans.

2.      Preventing both the creation and spread of highly infectious and lethal disease is of paramount importance and should be a top priority for the federal government.  In 2015, after the United States experienced outbreaks of two highly pathogenic, mixed-origin HPAI strains affecting wild birds and backyard and commercial poultry flocks, the United States Department of Agriculture ("USDA" or "the Agency") initiated a process to update its HPAI control and response protocols ("HPAI control plan").[1]  That process incorporated review of impacts to the human environment pursuant to the National Environmental Policy Act, 42 U.S.C. §§ 4321–4347 ("NEPA").  The agency accepted public comment on the HPAI control plan and associated NEPA analysis.

3.      Nearly five years ago, as part of the comment process on the agency's Environmental Assessment ("EA") that documents and contains the HPAI control plan, Plaintiff the Humane Society of the United States ("HSUS") asked the USDA to consider how its HPAI control plan can help prevent the development and spread of highly pathogenic zoonotic diseases.  HSUS requested that animals raised for food or egg production be placed in cage-free low stocking density environments, which would help slow the mutation and spread of diseases like Avian Influenza.  As HSUS

---

[1]      USDA APHIS, HIGH PATHOGENICITY AVIAN INFLUENZA CONTROL IN COMMERCIAL POULTRY OPERATIONS – A NATIONAL APPROACH: ENVIRONMENTAL ASSESSMENT 5 (July 2015) [hereinafter July 2015 EA].

proposed, the Agency could accomplish this by conditioning the indemnification payments it makes to producers—for birds and eggs that must be destroyed during an outbreak response—on their adoption of safe and effective management practices.

4.     Instead, USDA decided to essentially subsidize the dangerous and cruel confinement of billions of birds nationwide, despite being fully aware of the causal connection between dense confinement and the frequency and severity of bird flu outbreaks.  The Agency's "preferred alternative" plan permits the reimbursement of taxpayer dollars to the same farms whose poultry confinement practices helped incubate and spread disease in the first place, thereby allowing farms to maintain inhumane practices that will inevitably cause the cycle of outbreak to begin again. An outbreak control plan that indemnifies these industrialized animal operations, as USDA's plan does, illogically supports practices that threaten to expose every human to more frequent and more life-threatening pandemics.

5.     The "preferred alternative" plan also permits the killing and disposal of birds using practices that are hazardous to the environment and public health, including burying carcasses in unlined pits, burning them through open-air incineration, and the mass deployment of ventilation shutdown ("VSD"), which entails slowly suffocating and cooking the birds to death.

6.     This action challenges Defendant USDA, Animal and Plant Health Inspection Service ("APHIS") Veterinary Services' December 2015 Final Environmental Assessment, *High Pathogenicity Avian Influenza Control in Commercial Poultry Operations – A National Approach* (the "Final EA"),[2] which adopts the "preferred alternative" HPAI control plan but ignores the most logical alternative, and associated Finding of No Significant Impact ("FONSI"), in which

---

[2]     USDA APHIS, HIGH PATHOGENICITY AVIAN INFLUENZA CONTROL IN COMMERCIAL POULTRY OPERATIONS – A NATIONAL APPROACH:  FINAL ENVIRONMENTAL ASSESSMENT (Dec. 2015) [hereinafter Final EA].

APHIS[3] provides a legally inadequate assessment of containment options in response to the outbreak of an Avian Influenza strain affecting poultry throughout the United States, in violation of NEPA, 42 U.S.C. §§ 4321–4347; the implementing Council on Environmental Quality ("CEQ") regulations, 40 C.F.R. §§ 1500–1508; and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706.  Plaintiffs seek (i) a declaration that the Final EA and FONSI are contrary to law and (ii) an order requiring APHIS to reconsider its HPAI control plan by preparing an Environmental Impact Statement ("EIS") that satisfies the requirements of NEPA.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 701, *et seq.* because the United States is a defendant and Plaintiffs' claims arise under federal law.  The agency action challenged in this lawsuit is a final agency action subject to judicial review under 5 U.S.C. §§ 702, 704, 706.  This Court may grant declaratory relief, injunctive relief, and further relief it deems necessary or proper pursuant to 28 U.S.C. §§ 2201–02 and 5 U.S.C. §§ 705–06.

8.      Venue is proper under 28 U.S.C. § 1391(e)(1) because a substantial part of the Defendant Agency's violations of law occurred in this District, injury to Plaintiffs and their members and supporters occurred in this District, and because this action is brought against agencies of the United States and officers of the United States acting in their official capacities.  Moreover, Plaintiff Mercy For Animals, Inc. ("MFA") is headquartered and maintains its principal place of business in Los Angeles, California, located in this District.  Plaintiff Farm Sanctuary owns and operates a shelter for rescued farmed animals in Acton, California, located in this District.  Plaintiff HSUS maintains an office in this District.

---

[3]      APHIS, as used throughout this Complaint, refers to Defendant United States Department of Agriculture, Animal and Plant Health Inspection Service, Veterinary Services.

**PARTIES**

9.     Plaintiff HSUS is a tax-exempt 501(c)(3) nonprofit organization headquartered in Washington, D.C., with regional offices and several direct animal care facilities located throughout the country.  HSUS's mission is to "prevent animal cruelty, exploitation and neglect and to protect wild habitats and the entire community of life."[4]  HSUS promotes humane and environmentally sustainable agriculture, which includes fighting to stop the abuse of farmed animals, degradation of the environment, and detriment to human health that are associated with modern industrial agriculture systems.  HSUS and its members commit their resources to improving the lives of chickens and birds, among many other animals, in concentrated animal feeding operations ("CAFOs").  HSUS has an organizational interest in receiving adequate information to educate its members regarding the animals, including chickens and other poultry, that they support through their membership, and how those animals are impacted by federal actions.  HSUS has commented on these actions and expended significant resources on advocating for alternative approaches.  HSUS also has significant experience in challenging actions that harm animals under NEPA.

10.     HSUS has millions of members and supporters, many of whom live, work, and recreate in areas at risk of being impacted by the harms associated with the mass deployment of VSD, unlined burial pits, open-air burning, and other dangerous disposal and depopulation methods authorized by APHIS, including within this District.  HSUS members therefore have an aesthetic and recreational interest in ensuring the areas where they live, work, hike, photograph, bird-watch, or swim are not affected by dangerous water and air pollutants or damaged by disturbing views of piles of poultry corpses and their accompanying odors.  HSUS members also have a health and safety interest in preventing the spread of HPAI to humans.  HSUS

---

[4]     *Our Mission*, HSUS, https://www.humanesociety.org/our-policies#statement-2.

members who raise birds and pigs have an economic interest in preventing the spread of HPAI to their animals.[5]  Moreover, these members have an interest in preventing the development of HPAI in the areas they keep animals.  When an infected flock is identified, the government commonly establishes a control area wherein it will kill all birds in a 10 to 15-kilometer radius.  HSUS members have birds within that range of factory farms and are thus at risk of having government agents kill their birds.  As explained below, such outbreaks are made more likely and amplified by APHIS's ill-considered HPAI control plan.   HSUS members also benefit from adequate environmental impact analyses of a government agency's actions and are informed by HSUS's participation in that process on its members' behalf.  The HPAI control plan affects HSUS members' health, aesthetic, financial, and recreational interests, and proper consideration of the plan's impacts could help mitigate those effects.

11.    One such HSUS member owns a 480-acre, organic-certified, multi-generational farm on which the member raises cattle, pigs, and egg-laying hens outside on open pastures.  Another HSUS member is a certified-organic farmer who grows fruit crops, produces raw honey, collects eggs from free-range hens, and opens the farm to visitors for overnight stays, farm activities, and homesteading classes.  Both of these HSUS members are also situated near large industrial poultry operations and are therefore directly affected by the intensive confinement practices of such factory farms, which incubate and spread disease and, in turn, increase the risk that such HSUS members and their animals will be exposed to avian influenza.  These HSUS members each have a vested personal and economic interest in preventing the development of HPAI—made more likely by the Agency's HPAI control plan—and the use of harmful depopulation and carcass disposal methods to

---

[5]    HPAI spreads to pigs as well as birds.  *See, e.g.*, Clement Meseko et al., *Evidence of Exposure of Domestic Pigs to Highly Pathogenic Avian Influenza H5N1 in Nigeria*, SCIENTIFIC REPORTS (Apr. 12, 2018), https://www.nature.com/articles/s41598-018-24371-6.

control HPAI in the areas surrounding their respective farms.  A potential outbreak would jeopardize their health and the health of their families, deter visitors to their farms, force them to euthanize their animals, and cause them both emotional anguish and financial loss.  As APHIS acknowledges, an HPAI outbreak can have significant negative effects on the mental health of responders and owners of impacted birds (such as the HSUS members described herein), as can quarantine and movement restrictions.[6]

12.     Other HSUS members harmed by USDA's HPAI control plan include veterinarians and members with backyard flocks.  One HSUS member veterinarian lives among neighbors who have backyard flocks, including another HSUS member who has been raising chickens for nearly 35 years.  Both of these members are thus at increased risk of being exposed to avian influenza, a risk heightened due to the threats created by the Agency's HPAI control plan, which increases the risk of bird flu mutating and spreading.  HSUS's member veterinarian has studied alternative methods of depopulation, has serious concerns about the depopulation methods approved by the Agency's HPAI control plan, and fears the application of these depopulation methods tarnishes the reputation of veterinarians.  Should an outbreak occur, her neighbors' birds could be exposed to the virus.  This could lead to her being infected or her neighbors' birds being killed as part of the HPAI control plan if the depopulation control area encompasses her neighborhood, which would cause her and her neighbors—including the HSUS member who has a nearby backyard flock—extreme emotional distress.  Another HSUS member veterinarian has participated in the depopulation of birds at a farm sanctuary.  This was an incredibly traumatizing experience for her, and she fears having to engage in depopulation efforts again due

---

[6]     USDA APHIS, HIGHLY PATHOGENIC AVIAN INFLUENZA RESPONSE PLAN: THE RED BOOK 5-27 (May 2017), https://www.aphis.usda.gov/animal_health/emergency_management/downloads/hpai_response_plan.pdf [hereinafter APHIS Red Book].

to the threats created by the Agency's HPAI control plan, which distresses her.  Each of these members live and/or work in the District.

13.     These HSUS members also have an interest in information that would have been gained by the Agency if it had conducted a lawful NEPA review.  If USDA had done the appropriate environmental review under NEPA, all of these members would have important additional information about the potential environmental impacts of the Agency's HPAI control plan, and about whether the harms they are experiencing and risks they face will intensify or be mitigated as a result of the plan.

14.     Plaintiff MFA is a tax-exempt 501(c)(3) nonprofit organization incorporated in Delaware with its principal place of business in Los Angeles, California.  Founded in 1999, MFA's mission is to construct a compassionate food system by reducing suffering and ending the exploitation of animals for food.  To achieve these objectives, MFA works with companies to adopt animal welfare policies and plant-based alternatives to animal products, advocates for government policies that reduce the suffering of animals used for food, engages in capacity building and community organizing initiatives to promote effective development of the animal protection movement, conducts and releases investigative exposés of industrialized animal agriculture, and educates the public regarding farmed animal welfare and the dire environmental consequences of animal agriculture.  MFA and its supporters commit their resources to improving the lives of chickens and other poultry, among many other animals, in CAFOs.  MFA has an organizational interest in receiving adequate information to educate its supporters regarding the animals, including chickens and other poultry, that they support through their contributions, and how those animals are impacted by federal actions.  MFA has commented on many of these actions and expended significant resources on advocating for alternative approaches.

15.     MFA has supporters and employees who rescue and care for rescued birds and pigs, and who have emotional and economic interests in preventing the spread of HPAI to their rescued animals and to themselves.  In the event of an HPAI outbreak, which is made more likely due to the Agency's dangerous and short-sighted HPAI control plan, these individuals risk having their rescued birds die from disease or killed by the government, and also risk being exposed to HPAI themselves.

16.     One such MFA supporter lives in Ventura County with her husband, four children, six rescued chickens and one rescued pig.  She and her family care for these animals every day and are emotionally attached to them. She has made multiple donations to MFA over the last two decades.  An MFA employee who lives in Los Angeles County is actively involved in the rescue of local farmed animals, including four roosters, two ducks, two turkeys, and a pig that she has helped rescue and transport to local sanctuaries.  She has also volunteered at farmed animal sanctuaries in the District, providing hands-on care to the animals she helped rescue and to other birds and pigs at these sanctuaries.  Both of these individuals have a health and emotional interest in preventing the spread of HPAI to the animals they have rescued, in preventing those animals from being killed by the government in response to an outbreak, and in preventing the spread of HPAI to themselves and their families.

17.     Another MFA supporter runs a sanctuary for rescued farmed animals in Los Angeles County, where she provides lifelong care for animals rescued from slaughter or abuse, including birds and pigs.  She has also hosted several MFA events at her sanctuary, including employee retreats.  In addition to a health interest arising from her constant exposure to her rescued birds and pigs, she relies on her rescued birds and pigs to assist in educating and informing the public about farmed animals and the cruelties they suffer.  If she were to lose these animals to an HPAI outbreak—an event made more likely due to the hazards created by the HPAI control plan—her ability to further the mission of her sanctuary and to educate the public about the plight of farmed animals would be diminished.

18.     Another supporter of MFA is an enrolled citizen of the Lumbee Tribe of North Carolina who lives near a large-scale poultry farm in Robeson County. Robeson County is one of the poorest counties in North Carolina and one of the counties that the USDA has identified as a "county of persistent poverty."[7] At least 75% of the residents of Robeson County are American Indian, Black, or Latinx.[8] This supporter is concerned not only about the health risks of living close to a farm that is susceptible to an HPAI outbreak and may be the source of additional hazardous waste from depopulation carried out under the Agency's control plan, but also about the Agency's failure to conduct an environmental justice analysis and to identify and address the impact of the HPAI control plan on his community and on other vulnerable communities in Robeson County. These harms are amplified and made more likely by APHIS's unlawful failure to appropriately consider the effects of its HPAI control plan under NEPA.

19.     Plaintiff Farm Sanctuary is a tax-exempt 501(c)(3) nonprofit organization incorporated in Delaware that operates animal sanctuaries in Acton, California and Watkins Glen, New York. In addition, Farm Sanctuary leases an office in Los Angeles, California, which is used by program, administrative, and fundraising staff. Founded in 1986, Farm Sanctuary has rescued, rehabilitated, and provided lifelong care to thousands of farmed animals, including birds. It expends significant resources caring for these animals at its own sanctuaries, as well as coordinating placement of and transporting animals to other sanctuaries and members

---

[7]     *Persistent Poverty Counties 2015 Edition*, USDA ECONOMIC RESEARCH SERVICE (2015), https://www.ers.usda.gov/data-products/county-typology-codes/descriptions-and-maps/#ppov (The USDA defines "persistent poverty" where 20 percent or more of a county's population is living in poverty for three consecutive censuses.).

[8]     *QuickFacts: Roberson County, North Carolina*, U.S. CENSUS BUREAU (2019), https://www.census.gov/quickfacts/fact/table/robesoncountynorthcarolina,US/PST045219

---

of Farm Sanctuary's national Farm Animal Adoption Network.  With approximately 1.2 million members and constituents, Farm Sanctuary is one of the nation's leading farmed animal protection organizations.  Farm Sanctuary works to protect farmed animals from cruelty and to inspire change in the way society views and treats farmed animals.[9]  Farm Sanctuary promotes its mission by providing rescue, rehabilitation, and care for abused and neglected farmed animals, offering services involving adoptions, animal placement assistance, and animal care information, and conducting a variety of programs and disseminating literature and information to educate the public about farmed animal issues.  Farm Sanctuary also engages in advocacy efforts and campaigns with consumers, businesses, and communities to encourage them to consider farmed animal issues in their decision-making processes.  In addition, Farm Sanctuary monitors federal and state legislation, informs the public on legislation and issues involving farmed animals, and works through legislative and other political and grassroots processes to advocate on behalf of farmed animals and advance its mission.  Farm Sanctuary commits its resources to improving the lives of chickens and other birds, among many other animals, including those in CAFOs.  Farm Sanctuary has an organizational interest in receiving adequate information to educate itself and its supporters regarding the animals, including chickens and other poultry, that they support through their contributions, and how those animals are impacted by federal actions.  Farm Sanctuary has commented on government actions and expended significant resources on advocating for alternative approaches.

20.    Farm Sanctuary also has an organizational interest in protecting the safety of the birds it rescues and supports at its animal sanctuaries, as well as in protecting the health of its employees and volunteers who work alongside and care for these animals on a daily basis.  Farm Sanctuary has 399 birds housed at its sanctuaries, including 64 birds at the sanctuary it operates within this District.  It has

---

[9]     *About Us*, FARM SANCTUARY, https://www.farmsanctuary.org/about-us/.

27 employees working in roles at its sanctuaries that involve regular contact with the sanctuary animals, including birds, and Farm Sanctuary also regularly uses volunteers who come into contact with the animals.  Farm Sanctuary therefore has economic, health, and safety interests in preventing the spread of HPAI to the animals it cares for at its sanctuaries as well as its employees and volunteers who work with those animals.  These sanctuary operations are at risk of being impacted by the harms associated with the mass deployment of VSD, unlined burial pits, open-air burning, and other dangerous disposal and depopulation methods authorized by APHIS.  Furthermore, Farm Sanctuary has an organizational interest in preventing the development of HPAI in the areas it keeps animals, as the government commonly establishes a control area wherein it will kill all birds in a 10 to 15-kilometer radius, possibly including Farm Sanctuary's animals.  Additionally, Farm Sanctuary's employees and volunteers often develop personal relationships and emotional connections with the animals they have rescued, cared for, and known for many years, as do Farm Sanctuary members who get to know individual animals through the organization's Adopt a Farm Animal and Adopt a Turkey sponsorship programs.  Farm Sanctuary has an organizational interest in protecting the well-being of its staff, volunteers, and members who face injury due to the unsafe practices endorsed by USDA's HPAI control plan that could lead to the death of these animals through disease or government-mandated depopulation.

21.    One such Farm Sanctuary employee is a senior manager at the sanctuary in Acton, California.  She began volunteering with Farm Sanctuary in 2013 and has been a full-time employee since 2015. She is actively involved in the rescue of farmed animals, locally and nationally, including birds and pigs, provides care and support to these animals every day, has developed personal relationships with them, and is emotionally attached to them.  Accordingly, she has an interest in preventing the spread of HPAI to the animals she cares for at Farm Sanctuary and to sanctuary staff.  In her role, she is responsible for writing safety protocols for shelter staff and

implementing training on these protocols, and she is particularly concerned about the environmental and health impacts of the HPAI control plan. In the event of an HPAI outbreak, made more likely as a consequence of the Agency's HPAI control plan, this employee risks having the rescued animals she cares about killed, and also risks being exposed to HPAI herself. If she were to lose these animals to an HPAI outbreak, her ability to further her organization's mission would be diminished, she would suffer emotional distress, and her sanctuary would face injury due to a reduction in visitors and donations.

22.     Defendant USDA APHIS, Veterinary Services is an agency of the United States government that, pursuant to the Animal Health Protection Act, 7 U.S.C. § 8301 *et seq.*, is responsible for protecting and improving the health, quality, and marketability of US animals, animal products, and veterinary biologics by (1) preventing, controlling, and/or eliminating animal diseases, and (2) monitoring and promoting animal health and productivity.

23.     Defendant Kevin Shea is the Administrator of USDA APHIS. He is sued in his official capacity.

24.     Defendant Dr. Burke Healy is the Deputy Administrator of Veterinary Services and Chief Veterinary Officer of APHIS. In his prior role as Executive Director for Veterinary Services' Surveillance, Preparedness, and Response Unit, he served as the National Incident Commander for the HPAI outbreak of 2014–2015. He is sued in his official capacity.

25.     Defendant Dr. Mark Davidson is the Associate Administrator of APHIS. From November 2013 to February 2018, he served as Veterinary Services' Associate Deputy Administrator. He is sued in his official capacity.

## STATUTORY AND REGULATORY FRAMEWORK

### I. National Environmental Policy Act

26.     NEPA is the United States' "basic national charter for the protection of the environment." 40 C.F.R. § 1500.1(a). "NEPA procedures must insure that

environmental information is available to public officials and citizens *before* decisions are made and *before* actions are taken." *Id.* § 1500.1(b) (emphasis added). "Public scrutiny [is] essential to implementing NEPA." *Id.*

27.    NEPA requires federal agencies to prepare a "detailed" EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).  Accordingly, when an agency proposes to undertake an "action," the agency must first determine whether the action is one that "normally requires" the preparation of an EIS pursuant to NEPA and its implementing regulations.  40 C.F.R. § 1501.4(a).

28.    If the agency is not certain whether an EIS is required, it must prepare an Environmental Assessment ("EA") to determine whether to prepare an EIS or instead issue a FONSI.  *Id.* § 1501.4(b).  The EA must discuss the need for the proposal, evaluate alternatives that would cause less adverse environmental impacts, and provide sufficient evidence and analysis to support the agency's determination as to whether the proposed action will significantly affect the environment.  If an action *may* have a significant effect on the environment, or even if there are *substantial questions* as to whether it may, the agency *must* prepare an EIS.

29.    The Council on Environmental Quality ("CEQ") promulgated regulations implementing NEPA that are "binding on all Federal agencies."  40 C.F.R. § 1500.3.  They instruct that analysis of whether an action will have a "significant" impact on the environment—thus warranting the preparation of an EIS—requires considerations of "context" (effects at the national, regional, and local levels) and "intensity" (the severity of the impact).  *Id.* § 1508.27.

30.    Ten "intensity" factors help determine whether an agency action may cause significant impacts.  *Id.* § 1508.27(b).  Such factors include:

- "Unique characteristics of the geographic area such as proximity to . . . prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas;"

- Effects that are "highly uncertain or involve unique or unknown risks" or "likely to be highly controversial;"
- The "cumulative impacts" of the proposed action;
- "The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973;" and
- The extent to which the action threatens violation of other laws.

*Id.* The presence of even one of the factors may require preparation of an EIS.

31.   NEPA requires that agencies take a "hard look" at the environmental effects of their planned action, even after a proposal has received initial approval. *See Ctr. for Biological Diversity v. Nat'l Hwy. Traffic Safety Admin.*, 538 F.3d 1172, 1194 (9th Cir. 2008).  Both an EIS and an EA must discuss a proposed action's direct, indirect, and cumulative effects.  *Id.* § 1502.16.  Direct effects are "caused by the action and occur at the same time and place," whereas indirect effects are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable."  *Id.* § 1508.8.  Cumulative effects are "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions."  *Id.* § 1508.7.

32.   For purposes of NEPA, "federal actions" include "circumstance[s] where the responsible officials fail to act and that failure to act is reviewable by courts or administrative tribunals under the [APA] or other applicable law as agency action."  *Id.* § 1508.18.  "Actions include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies; new or revised agency rules, regulations, plans, policies, or procedures; and legislative proposals."  *Id.* § 1508.18(a).

33.   Agency actions that are based on unlawful NEPA analyses, such as the HPAI control plan and subsequent HPAI outbreak responses, are presumptively ill-

informed, and thus arbitrary rather than fully reasoned, and should generally be set aside for reconsideration in light of a new and lawful NEPA analysis.

## II.  The Administrative Procedure Act

34.  NEPA does not contain an internal standard of review, so judicial review is therefore governed by the APA.  Under the APA, courts "shall hold unlawful and set aside" agency action, findings, or conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" or "without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (D).

35.  Where an agency fails to adequately analyze a project's environmental impact in an EA and fails to provide a reasoned and convincing explanation for its decision to not prepare an EIS, it has acted arbitrarily and capriciously in violation of the APA and NEPA.

## III.  The Federal Clean Water Act

36.  The Clean Water Act ("CWA") serves to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).  It operates in large part by controlling the discharge of pollution from point sources into waters of the United States.  *See, e.g.*, *id.* §§ 1342, 1362(14).

37.  Among other things "the term point source means any . . . concentrated animal feeding operation . . . from which pollutants are or may be discharged."  *Id.* § 1362(14).

38.  The CWA proscribes "the discharge of *any* pollutant by *any* person" except in circumstances as specified by the CWA.  *Id.* § 1311(a) (emphasis added).

## IV.  The Clean Air Act

39.  The Clean Air Act ("CAA") serves to "protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population," 42 U.S.C. § 7401(b)(1), and to "encourage . . . Federal, State, and local governmental actions . . . for pollution prevention." *Id.* § 7401(c).

40.     Under the CAA, noncompliance penalties are imposed against every person who owns or operates a stationary source[10] that does not comply with the requirements of the Act.  *Id.* § 7420(a)(2)(A).  The CAA limits hazardous pollutants through emission standards.  *Id.* § 7412(d).  Tetrachlorodibenzo-p-dioxin (also known as "dioxin"[11]) is considered a hazardous air pollutant under the CAA.  *Id.* § 7412(b)(1).

## V.     The Endangered Species Act

41.     It is unlawful to "take" an endangered species of fish or wildlife.  16 U.S.C. § 1538(a)(1)(B).  Within the meaning of the Endangered Species Act ("ESA"), to take means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  *Id.* § 1532(19).

## VI.    The Migratory Bird Treaty Act

42.     The Migratory Bird Treaty Act ("MBTA") makes it unlawful to "take, capture, kill, [or] attempt to take, capture, or kill . . . any migratory bird . . . ."  *Id.* § 703(a).

---

[10]    "The term 'stationary source' means generally any source of an air pollutant except those emissions resulting directly from an internal combustion engine for transportation purposes or from a nonroad engine or nonroad vehicle[.]" 42 U.S.C. § 7602(z).

[11]    *2,3,7,8-Tetrachlorodibenzo-P-dioxin*, NAT'L CENTER FOR BIOTECHNOLOGY INFORMATION, https://pubchem.ncbi.nlm.nih.gov/compound/Tetradioxin#section=Top  (last visited April 5, 2020) ("2,3,7,8-Tetrachlorodibenzo-p-dioxin . . . is often referred to simply as dioxin and is the reference for a number of compounds which are similar structurally and have dioxin-like toxicity. [It is] extremely toxic to mammals, with a wide variation in sensitivity among species. Longer-term exposure of test mammals to lesser amounts can affect reproduction, cause birth defects, damage the liver and suppress the immune system. Several studies suggest that exposure to TCDD increases the risk of several types of cancer in people.").

## VII.   The Bald And Golden Eagle Protection Act

43.   The Bald and Golden Eagle Protection Act penalizes anyone who "knowingly, or with wanton disregard for the consequences of his act take[s] . . . any bald eagle commonly known as the American eagle, or any golden eagle . . . ." *Id.* § 668(a).

## FACTS GIVING RISE TO CAUSES OF ACTION

44.   In 2014, the U.S. poultry industry produced 8.54 billion broilers (*i.e.*, chickens bred and raised specifically for meat production), 238 million turkeys, and over 365 million hens that laid roughly 101 billion eggs.[12]  According to the 2012 Census of Agriculture, 21,000 farms produced 5 million ducks primarily in California, Indiana, and Pennsylvania, while about 10,000 farms produced 106,000 geese, primarily in Texas, South Dakota, and California.[13]  Moreover, over 8 billion chickens were slaughtered for human consumption throughout the U.S. in 2012, primarily in the southeast and west coast regions.[14]

45.   Most of these birds are produced in factory farm systems where they are tightly confined in conditions that incubate and spread disease.  Any one of these billions of factory-farmed animals may produce a novel Avian Influenza that could do extraordinary harm to the U.S. food supply and potentially to humans.  Bird flu is a recurring problem with epidemic and pandemic potential.  For example, as recently as March 2020, the USDA notified the World Organisation for Animal Health (formerly, the "OIE") of multiple low pathogenic Avian Influenza infections on farms in two counties in North Carolina.[15]

---

[12]   Final EA at 13.

[13]   *Id.* at 12–13.

[14]   *Id.*

[15]   Fabian Brockotter, *Multiple LPAI Infections in US Turkey Operation*, POULTRY WORLD (Mar. 19, 2020),

46.     Recently, a new HPAI strain, H5N6, has been detected in thousands of birds across several Asian and European countries.[16]  In March 2017, a HPAI strain, H7N9, sickened two commercial chicken breeder flocks in Tennessee.[17]

47.     In December 2014, APHIS identified two highly pathogenic, mixed-origin HPAI strains affecting wild bird, backyard, and commercial poultry flocks in the Pacific, Central, and Mississippi flyways.[18]  The Pacific Flyway is a migratory bird path that extends through Alaska, Arizona, California, Idaho, Nevada, Oregon, Utah, Washington, and portions of other western U.S. states.

48.     In 2015, 223 detections of HPAI were reported in fifteen U.S. states, including throughout California, affecting roughly 50 million chickens and turkeys nationwide ("2015 HPAI outbreak").[19]

49.     All told, USDA estimates the 2015 HPAI outbreak and the response to it cost the US economy between one and $3.3 billion.  Importantly, according to the World Organisation for Animal Health, investing in preventing outbreaks is far cheaper than trying to contain them, and investments in prevention pay off well.[20]

---

https://www.poultryworld.net/Health/Articles/2020/3/Multiple-LPAI-infections-in-US-turkey-operation-557469E/.

[16]   Jackie Linden, *New Avian Flu Outbreaks Impact China, India, Philippines*, WATTAGNET (Mar. 19, 2020), https://www.wattagnet.com/articles/39870-new-avian-flu-outbreaks-impact-china-india-philippines?v=preview.

[17]   *2nd Case of HPAI Detected in Tennessee*, THE CHATTANOOGAN (Mar. 16, 2017), https://www.chattanoogan.com/2017/3/16/344040/2nd-Case-Of-HPAI-Detected-In-Tennessee.aspx.

[18]   Final EA at 5.

[19]   *Id.* at 6–8.

[20]   The World Organisation for Animal Health & Agra CEAS Consulting, *Prevention and Control of Animal Diseases Worldwide:  Economic Analysis – Prevention Versus Outbreak Costs* 12–14 (2007),

50.     USDA is heavily involved, and plays a controlling role, in every step of the outbreak response process at the national, state, and local levels.  The Agency is responsible for coordinating the national response to HPAI in support of state and local government efforts, and APHIS works directly with local poultry producers and farmers in their response efforts.  In response to the 2014-2015 HPAI outbreak, APHIS deployed more than 3,400 personnel in various roles to support state and local containment efforts throughout the United States, and the Agency spent nearly $850 million in support of response activities and indemnity payments to local farmers.[21]

51.     As part of its control and response efforts in the wake of the 2014-2015 HPAI outbreak, APHIS established an Incident Coordination Group ("ICG") to provide national policy and coordinate strategic guidance in response to the outbreak. APHIS also provided substantial and necessary personnel and resources, including contractor support, to specific outbreak locations in order to oversee and assist with rapid depopulation of bird flocks.[22]

52.     APHIS is also heavily involved in the disposal of animal carcasses after depopulation.  In response to the 2014-2015 HPAI outbreak, APHIS deployed a disposal expert to a commercial turkey flock in California as early as January 2015, and APHIS continuously deployed contractors to oversee and support large-scale disposal operations conducted by local farmers in California and throughout the country.  APHIS also provided necessary resources to assist in depopulation,

---

https://www.oie.int/fileadmin/Home/eng/Support_to_OIE_Members/docs/ppt/ OIE_-_Cost-Benefit_Analysis__Part_I_.pdf.

[21] USDA APHIS, FINAL REPORT FOR THE 2014-2015 OUTBREAK OF HIGHLY PATHOGENIC AVIAN INFLUENZA (HPAI) IN THE UNITED STATES (Aug. 2016), at v–vi.

[22] *Id.* at vi.

including by acquiring incinerators and obtaining agreements with local landfills to accept the remains of animal carcasses.[23]

53.   APHIS conducted 232 appraisals, the first of which was conducted on January 23, 2015 in California, to make indemnity payments to poultry producers who were impacted by the 2014-2015 HPAI outbreak.  APHIS paid out approximately $200 million in indemnity payments to poultry farmers throughout the country related to the outbreak.[24]

54.   The availability of federal indemnity payments is a significant economic inducement that predictably motivates producers to satisfy any and all APHIS prerequisites needed to qualify for such payments.  Recent history—indemnity payments to hundreds totaling roughly $200 million—demonstrates that producers will respond to this obvious economic incentive by complying with all APHIS requirements to receive such payments.  Such APHIS requirements begin soon after HPAI is detected at a given farm and cover the entire response process, through depopulation, indemnification, disposal of dead birds and ultimately restocking.

55.   Although poultry producers and state agents play a role in response to HPAI outbreaks, APHIS plays a controlling role in every step of the process. At each impacted facility, APHIS imposes mandatory requirements and controls activities from initial detection through depopulation, indemnification, disposal of killed birds and restocking.[25] Failure to adhere to APHIS's requirements means a business owner will not receive an indemnity payment.  Given APHIS's controlling role as described herein, non-APHIS third parties, including state agents and impacted facility owners

---

[23]   *Id.* at 36–37.

[24]   *Id.* at 41.

[25]   *See Landfills and Highly Pathogenic Avian Influenza (HPAI) Response*, USDA APHIS (May 2016) at 24, https://www.aphis.usda.gov/animal_health/emergency_management/download s/hpai/landfillsandhpairesponse.pdf (providing an overview of the response process directed by USDA).

---

and operators, do not exercise independent or unfettered discretion in the response to HPAI outbreaks.[26]

56.     As APHIS explained in its 2014-2015 HPAI Outbreak Final Report, the Agency is responsible for "continu[ing] to work with all stake holders to prepare for another outbreak of HPAI, using the lessons [it] learned during the 2014-2015 outbreak to improve operations . . . in the field."[27]

57.     In July 2015, APHIS prepared its first EA addressing the impacts of HPAI and APHIS's control plan for a national response ("July 2015 EA").  APHIS was statutorily required to prepare a "detailed statement" of "alternatives to the proposed action." 42 U.S.C. § 4332(2)(C).  Instead, APHIS's inadequate evaluation considered only two responses to an HPAI crisis:  (1) do nothing (*i.e.*, placing the burden of handling an HPAI epidemic on state and local authorities), or (2) continue "to provide assistance to States and local authorities in establishing and enforcing HPAI quarantines and conducting bird flu control activities as outbreaks occur throughout the nation" (the "preferred alternative").[28]

58.     The preferred alternative permits the use of hazardous depopulation methods without appropriately assessing their environmental impact, including VSD—a highly dangerous and extremely cruel practice that involves shutting down a facility's entire ventilation system, which causes a build-up of carbon dioxide and heat in the facility that suffocates the birds.  This essentially cooks the conscious birds to a protracted and unnecessarily torturous death.  The preferred alternative also permits disposal methods that pose significant risks, such as incineration and burial in

---

[26]     APHIS Red Book at 2-3–2-6, 3-5–3-10 (describing USDA and APHIS as taking the predominant role in HPAI incident response, with little involvement from state animal health officers).

[27]     USDA APHIS, FINAL REPORT FOR THE 2014-2015 OUTBREAK OF HIGHLY PATHOGENIC AVIAN INFLUENZA (HPAI) IN THE UNITED STATES 45 (Aug. 2016).

[28]     *See* July 2015 EA at 7.

unlined pits.  Using these disposal methods, the carcasses of infected birds are broken down, and their bodily fluids, chemical and biological leachate components, agricultural dust, and other gases (including dioxin[29]) are released into the surrounding environment, threatening the health and safety of both humans and wildlife.

59.    In August 2015, APHIS issued its FONSI with respect to the July 2015 EA of its HPAI control plan, concluding "there would be no significant impact to the human environment from the implementation of the preferred alternative."[30]  On September 4, 2015, APHIS made the July 2015 EA and FONSI available to the public for review and comment.[31]

60.    On October 5, 2015, HSUS submitted a comment on APHIS's HPAI control plan, which emphasized the detrimental impacts of APHIS's proposed depopulation and disposal plan and explained how it violated NEPA, as reflected in this complaint.[32]  Notably, HSUS's comment proposed reasonable and viable alternatives to APHIS's plan, including conditioning APHIS's indemnification of poultry producers' depopulated livestock on such producers limiting the stocking density of the birds housed in their farms and facilities, rather than on the number of

---

[29]    Dioxin can cause liver and immune system damage, birth defects, and reproductive problems, and has been traced to cancer in some people. *See* NAT'L CENTER FOR BIOTECHNOLOGY INFORMATION, *supra* note 8.

[30]    USDA APHIS, Finding of No Significant Impact for High Pathogenicity Avian Influenza Control in Commercial Poultry Operations – A National Approach (Aug. 2015) [hereinafter FONSI].

[31]    Highly Pathogenic Avian Influenza; Availability of an Environmental Assessment and Finding of No Significant Impact, 80 Fed. Reg. 53,485 (Sept. 4, 2015).

[32]    HSUS, Comment Letter on Environmental Assessment for High Pathogenicity Avian Influenza Control in Commercial Poultry Operations – A National Approach (Oct. 5, 2015) [hereinafter HSUS Comment].

birds culled by the producer.[33]  HSUS made it clear that "APHIS should require producers to agree that all their birds be kept cage free and given enough space to spread their wings and turn around freely."[34]  As HSUS suggested, conditioning the USDA's reimbursement of poultry producers for lost stock on their adoption of improved confinement measures would help limit future HPAI outbreaks from rapidly spreading and potentially causing significant harm to humans, animals, and the environment.

61.    In December 2015, APHIS published a supplemental EA setting forth an HPAI control plan that was essentially identical to the original inadequate EA.[35]  In the Final EA, APHIS failed to broaden the scope or depth of its analysis of alternative containment approaches and failed to sufficiently respond to the serious concerns raised by HSUS in its comment.  Significantly, APHIS's Final EA materially ignored the alternative proposal in HSUS's comment to establish indemnification conditions that would create effective safeguards to curb the harmful impacts of a future outbreak.  In response to the suggestion that it should "reduce the number of birds allowed in poultry houses[,]" APHIS simply noted that "APHIS and the poultry industry agree that the impact of an HPAI outbreak is amplified where poultry production is highly concentrated or networked," but that "APHIS is not going to adopt this type of governmental restriction at this time."[36]  Instead, APHIS essentially reaffirmed its FONSI and declined to prepare an EIS.

62.    APHIS declined to prepare an EIS despite having conducted an EIS in December 2015, entitled *Carcass Management During a Mass Animal Health Emergency* ("Carcass Management EIS"), which analyzed the environmental impacts

---

[33]    *Id.* at 14–18.

[34]    *Id.* at 16.

[35]    *See* Final EA.

[36]    *Id.* at 77.

of various carcass management alternatives that could be implemented as part of an HPAI outbreak crisis.[37]  As discussed below, APHIS's preparation of the 2015 Carcass Management EIS further demonstrates the need for an HPAI-Specific EIS.

63.     As set forth below, APHIS's analyses are egregiously insufficient to satisfy NEPA for several reasons, including for failing to sufficiently evaluate reasonable alternatives, inadequately examining the consequences, environmental impacts, and adverse effects of its actions, and failing to prepare an EIS.

64.     Also, as set forth below, APHIS's proposed depopulation and disposal methods threaten to violate multiple state and federal laws, including federal laws enacted to protect the environment, such as the Clean Water Act, the Clean Air Act, the Endangered Species Act, and the respective implementing regulations associated with such acts.  Because APHIS failed to adequately evaluate the potential impact of its HPAI control plan on these important environmental laws, APHIS's failure to prepare an EIS violates NEPA.  42 U.S.C. § 4332(2)(C).

## VIII.  <u>APHIS Failed To Consider An Adequate Range Of Reasonable Alternatives For Combatting HPAI</u>

65.     APHIS's EAs are deficient because they fail to consider a reasonable range of alternative methods for combatting HPAI, as required by NEPA.  *Id.*  APHIS was therefore obligated to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."  *Id.* § 4332(2)(E).  Accordingly, CEQ requires that APHIS analyze the possible environmental impacts of a proposed action and weigh available alternatives.  *See* 40 C.F.R. § 1508.9.

66.     Significantly, APHIS failed to meaningfully consider conditioning indemnification on reducing stocking density and shifting to cage-free, low stocking

---

[37]     USDA APHIS, FINAL PROGRAMMATIC ENVIRONMENTAL IMPACT STATEMENT, CARCASS MANAGEMENT DURING A MASS ANIMAL HEALTH EMERGENCY, at v (2015) [hereinafter Carcass Management EIS].

density production as a viable alternative method to control and contain HPAI. Establishing such conditions would reduce the severity of outbreaks, ensure that more of the animals are treated humanely, cause fewer birds to be killed and disposed of in the event of an outbreak, and mitigate much of the environmental impacts that severely affect the welfare of both humans and wildlife.  Even after HSUS directly proposed a plan involving indemnification conditions and explained its advantages in the comment it submitted to APHIS, the Agency ignored this indemnification proposal and did not address indemnification in the Final EA and FONSI.

67.     Massive poultry raising operations increase the likelihood that an HPAI outbreak will be severe and uncontrollable.[38]  This likelihood increases specifically in caged poultry flocks because "cages can be difficult to disinfect and the housing may harbor breeding populations of rodents and other potential vectors such as flies or littler beetles."[39]  Indeed, even common houseflies can serve as transmitters of HPAI amongst chickens.  As a result, the disease is more likely to mutate and spread: "[a]mplification occurs if the size of the epidemic in humans is increased due to transmission of the influenza into the CAFO species which leads to an epidemic in the CAFO species, and subsequent transmission back to the local human population."[40]

68.     Poultry factory farm facilities are vented with large fans to maintain specific temperatures.  These same vents emit dust from poultry flocks, which can

---

[38]   *See* Final EA at 77 ("APHIS and the poultry industry agree that the impact of an HPAI outbreak is amplified where poultry production is highly concentrated or networked."); Roberto A. Saenz et al., *Confined Animal Feeding Operations as Amplifiers of Influenza*, 6 VECTOR-BORNE & ZOONOTIC DISEASES 338, 339 (2006) ("The crowding of swine and poultry in CAFOs increases the transmission of influenza viruses.").

[39]   HSUS Comment at 15 (citing a study conducted by the European Food Safety Authority).

[40]   Saenz, *supra* note 28, at 339.

---

consist of bedding, feathers, feces, and a high concentration of micro-organisms. When the wind picks up this dust, it can be blown to a nearby facility or community, potentially increasing the transmission of HPAI.

69.     APHIS concedes that airborne transmission of HPAI can occur, particularly in high winds, and studies confirm that HPAI can spread through air.[41]  If HPAI were to mutate and begin infecting humans, airborne emissions could rapidly spread the virus and cause devastating results.[42]  The EAs discuss the use of ventilation systems at poultry facilities, but do not acknowledge them as a potential source of disease transfer.  APHIS failed to consider the implementation of viable measures that encourage a lower bird stocking density, which would result in fewer airborne particles passing through the system and decrease the threat of spreading HPAI.

70.     In direct violation of NEPA, the Agency neither "rigorously explore[d]" nor "objectively evaluate[d]" structuring indemnification procedures to discourage these dangerous, high-density animal operations as part of a reasonable alternative approach.  40 C.F.R. § 1502.14(a); 42 U.S.C. § 4332(2)(E).  APHIS distributes indemnification payments to producers for birds and eggs that must be destroyed during an outbreak response based on "the fair market value, as determined by the Secretary, of the destroyed animal, article, facility, or means of conveyance."  7 U.S.C. § 8306(d)(2).  However, payments shall not be made when an owner handles an animal "in violation of an agreement for the control and eradication of diseases or

---

[41]     Final EA at 6, 21.

[42]     High-density poultry operations serve as an opportunity and conduit for HPAI, and may increase the chances of HPAI mutating and becoming a massive threat to human health. *See* Michael Greger, *The Human/Animal Interface: Emergence and Resurgence of Zoonotic Infectious Diseases*, 33 CRITICAL REVIEWS IN MICROBIOLOGY 243, 265 (2007), http://www.birdflubook.org/resources/Greger_2007_CRM_33(4)_243.pdf; *see also* Saenz, *supra* note 28, at 338–46

---

pests in violation of this chapter." *Id.* § 8306(d)(3).  Accordingly, APHIS should have considered implementing indemnification procedures that incentivize producers to stock birds in safer conditions at much lower densities than in current facilities that pose serious risks to both human and environmental health.

71.     As explained above, this alternative would greatly diminish environmental impacts, threats to public health, federal response costs, and inhumane treatment of poultry populations in ways that the preferred and no action alternatives do not.  APHIS was required to assess this reasonable option, especially in light of the comment HSUS submitted that highlighted indemnification as a major component of its recommended alternative proposal.  By disregarding these proposed indemnification conditions in its EAs and FONSI, APHIS violated NEPA and the APA.

72.     Instead, APHIS's inadequate evaluation considered only two deficient responses to a HPAI crisis.  Under the "no action" alternative, "APHIS would not be involved in HPAI depopulation, transport and disposal of carcasses, and disinfection of equipment and premises."[43]  Nor would APHIS "address the impacts perpetuated by the continued presence and genetic reassortment of AI viruses across the nation."[44]  In contrast, under the preferred alternative, APHIS would use an "Adaptive Management Approach," which purports to control HPAI through surveillance, quarantine, depopulation, carcass management, cleaning and disinfection, and environmental sampling.  However, the Adaptive Management Approach entails disposing of poultry carcasses using problematic methods such as VSD, landfilling, rendering, incineration, composting, and mass-burial.[45]  The assessment of these approaches in the EAs fails to show that the methods used to kill and dispose of

---

[43]     Final EA at 19.

[44]     *Id.* at 25.

[45]     *Id.* at 74–76.

infected birds will not have a significant impact on human health and the environment.

73.     It is not enough to study only the "no-action" and "preferred" alternatives.  In the alternatives analyses, the EAs must "provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9(a)(1).  Because the EAs considered only two options for combatting HPAI, their analyses are insufficient to satisfy the basic requirements of NEPA.  *See Nat'l Hwy. Traffic Safety Admin.*, 538 F.3d at 1218, 1224–27 (holding that NHTSA violated NEPA by preparing an inadequate EA that "considered a very narrow range of alternatives.").

74.     Both EAs fail to consider the likelihood that hazardous methods of depopulation and carcass management, such as VSD, unlined burial, and incineration, will be utilized, and also fail to consider a range of reasonable, safer, and more humane alternatives.  One such alternative is a nitrogen filled foam-based euthanasia method developed in 2006 and commonly used in Europe.  Unlike water-based foams approved under the HPAI control plan, the gases in this foam render birds unconscious before they suffocate.

75.     Moreover, by only considering no action and its Adaptive Management Approach, APHIS disregarded the possibility of implementing tighter restrictions to ensure that one of the most dangerous forms of disposal—unlined burial—is never used.

76.     As previously discussed, the use of unlined burial pits for the mass-disposal of bird carcasses may contaminate nearby water sources, and the likelihood of such pollution increases as the number of carcasses increases.  The use of unlined burial pits may also "release gases associated with anaerobic decomposition, such as carbon dioxide, carbon monoxide, nitrogen oxides, sulfur dioxide, hydrogen chloride

and fluoride, and methane."[46]  Additionally, unlined burial pits and the heavy machines used to dig trenches and remove topsoil to create such pits "*will* impact the physical properties of soil," including "increased erosion during and after burial activities have occurred."[47]

77.   Unlined mass-burial may also cause serious harm to humans.  "Public health impacts associated with unlined burial arise from potential exposure to pathogens and decomposition chemicals released into the environment, including surface and ground waters. . . . Unlined burial releases high concentrations of ammonia, organic acids, and gases (*e.g.*, carbon dioxide or methane) . . . which may be toxic to humans."[48]

78.   Further, as detailed by APHIS in the December 2015 Carcass Management EIS, "[u]nlined burial and open-air burning of carcasses during a mass animal health emergency are expected to have the greatest impacts to the environment, particularly when carcasses are contaminated with biological, chemical, and/or radiological agents not naturally found in animal carcasses."[49]  HPAI would qualify as such an agent.  The same EIS also noted that "current environmental conditions at carcass management sites could already be compromised, and this should be considered in context of any potential for additional impacts from managing carcasses."[50]

79.   In light of these hazardous effects and the "variety of [other] methods for disposal of poultry carcasses,"[51] APHIS was required to consider and analyze a

---

[46]   Final EA at 27.

[47]   *Id.* at 28–30.

[48]   *Id.* at 34.

[49]   Carcass Management EIS at vi–vii.

[50]   *Id.* at 131.

[51]   Final EA at 75.

---

control plan that eliminated unlined burial as a potential method of carcass disposal. Instead, APHIS simply notes "[i]f unlined burial is considered for use at a site, APHIS guidance recommends a site-specific investigation be performed prior to selecting this disposal method to avoid groundwater impacts."[52]  The EA is therefore inadequate because it fails to examine a viable alternative in which unlined burial is never used due to the substantial dangers it poses to humans, animals, and the environment.

## IX.   APHIS's Proposed Actions Threatened, And Continue To Threaten Violations Of Federal And State Laws

80.    As noted above, in determining whether to prepare an EIS, APHIS was required to assess "[w]hether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment," and "[t]he degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973."  40 C.F.R. § 1508.27(9)–(10).  APHIS's proposed depopulation and disposal practices threaten violations of the CWA, CAA, ESA, MBTA, Bald and Golden Eagle Protection Acts, and various state laws, and APHIS failed to adequately evaluate these threats in its EAs.  These potential violations are another reason APHIS's failure to prepare an EIS violates NEPA.  42 U.S.C. § 4332(2)(C).

### A.    Threatened Violations Of The Clean Water Act

81.    Historically, small independent farms raised poultry in the U.S. However, over the last few decades, many of these farms have been replaced by CAFOs, which are large-scale industrial agricultural facilities that raise a large number of animals for human consumption in closely confined areas.

---

[52]    *Id.* at 79.

82.     Although APHIS recognizes that "every improperly managed poultry carcass could become a point source of water pollution,"[53] the EAs do not mention that *all* CAFOs are intended to be regulated as "point sources" under the CWA.  *See* 33 U.S.C. § 1362(14).  Nor do the EAs mention that many CAFOs fail to operate with even a basic CWA permit, or that many farming operations fall slightly outside the parameters of the specific, statutory definition of "CAFO,"[54] meaning that innumerable point sources may not be counted or regulated as CAFOs.

83.     APHIS also fails to identify how many of the thousands of farms that have been or may be impacted by HPAI outbreaks are CAFOs.  In 2011, the EPA estimated that there were over 24,000 CAFOs in the U.S., several thousand of which confine birds.[55]

84.     The risk to water quality from the disposal of hundreds of thousands of poultry carcasses nationwide, statewide, and locally—especially by CAFO facilities—is astronomic, and should have been more fully analyzed by APHIS in advance of finalizing its national approach to HPAI, as required by NEPA.

85.     Specifically, during carcass decay, contaminants such as ammonia-nitrogen, phosphorous, and chloride may leach into groundwater, while waste can carry pathogens.[56]  Drugs given to birds may also leach into the soil and groundwater, as evidenced by the "[e]levated levels of phosphorus, nitrogen, chloride, antibiotics, hormones, and veterinary pharmaceuticals [that] have been observed in soils

---

[53]     Final EA at 20.

[54]     *See* EPA, CAFO CONSOLIDATED FINAL RULES (2008), https://www.epa.gov/sites /production/files/2015-08/documents/cafo_final_rule2008_comp.pdf.

[55]     *See* EPA, SUPPORTING STATEMENT FOR THE INFORMATION COLLECTION REQUEST FOR REVISIONS TO NPDES RULES FOR CONCENTRATED ANIMAL FEEDING OPERATIONS—PROPOSED 308 RULE, EPA-HQ-OW-2011-0188-0055, at 9 (2011).

[56]     Final EA at 28.

---

surrounding unlined burial pits."[57]  Additionally, poultry by-products and waste can contain pathogens that contaminate water sources, and the Avian Influenza virus can survive in bird fecal material and may remain infectious for extended durations depending on water temperature.[58]

86.    APHIS's EAs fail to identify which drugs and compounds are commonly administered to poultry, and they fail to address the potential impact of burying several hundreds of thousands of birds containing harmful drugs together in unlined pits.

87.    The EAs also fail to consider that the use of pharmaceuticals in poultry flocks increases when producers fear an outbreak of infection, and when signs of illness first appear.  For instance, poultry producers outside of the U.S. have unlawfully used antiviral drugs to try to stop the outbreak of Avian Influenza, with serious human consequences.

88.    These drugs and other compounds, together with leachates[59] from thousands of animals decomposing in unlined burial pits, threaten to cause water pollution and violate the CWA.  Although the EAs cursorily acknowledge this risk, APHIS nevertheless fails to set forth even the most basic information about the types and amounts of pharmaceutical leachates and their proximity to surface and groundwater in different regions of the country.  40 C.F.R. § 1508.27(a) ("the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region . . . and the locality.").  Thus, the EAs are missing critical information essential to an adequate assessment of environmental impacts at the local, state, or national level.

---

[57]    *Id.* at 30.

[58]    *Id.* at 20, 28

[59]    Leachate is the liquid that is formed when water comes into contact with decomposing waste and biomass, including bodily fluids that leak from dead animals.  Final EA at 6.

89.     APHIS attempted to explain this critical failure by simply noting, "[i]f unlined burial is considered for use at a site, APHIS guidance recommends a site-specific investigation be performed prior to selecting this disposal method."[60] However, NEPA requires more.  Specifically, such "environmental information [must be] available to public officials and citizens *before* decisions are made and *before* actions are taken."  40 C.F.R. § 1500.1(b) (emphasis added).  Moreover, given the necessity of responding quickly and rapidly disposing of carcasses, conducting site-specific EAs or EIS's for each HPAI outbreak while simultaneously trying to contain it is impractical.

90.     Moreover, after listing several other potential impacts on water quality parameters, such as pH, conductivity, biological oxygen demand, nutrient loading from phosphorus and nitrogen, and decreasing dissolved oxygen, APHIS explicitly states that "the potential for impacts to water quality rises as the number of carcasses increases."[61]  Again, however, the EA does not meaningfully analyze such increased risk, especially as it relates to carcass disposal, facility restocking, or the lack of facility CWA permitting.

### B.     Threatened Violations Of State Clean Water Laws

91.     For the same reasons, the actions outlined in the EAs also threaten violations of the robust body of state laws that protect surface and groundwater from pollution, some of which are even broader in scope than the CWA.  These laws affect both small farms and CAFOs, and may protect groundwater even absent a connection to surface water.

92.     For instance, California strongly protects against groundwater pollution, and the state's Sustainable Groundwater Management Act establishes Groundwater Sustainability Agencies, sustainability plans, and state evaluation and assessments.

---

[60]     Final EA at 79.

[61]     Final EA at 28.

CA WATER § 10720 *et seq*.  California's Water Law reflects the public's "primary interest in the conservation, control, and utilization of the water resources of the state," and intends to advance that interest by ensuring the protection of the "quality of all the waters of the state," including "any surface water or groundwater . . . within the boundaries of the state," "for the public's use and enjoyment."  *Id*. §§ 13000, 13050; *Tesoro Refining & Mktg. Co. LLC v. L.A. Regl. Water Quality Control Bd*., 255 Cal. Rptr. 3d 343, 347 (Cal. Ct. App. 2019).  Likewise, Minnesota—one of the "top five turkey production states"[62]—has enacted a regulation imposing, whenever practical, a statewide goal of maintaining groundwater "free from any degradation caused by human activities." MINN. STAT. ANN. § 103H.001 (West 2018).  Similarly, South Dakota has declared that "pollution of groundwater . . . constitutes a menace to public health, welfare and the environment," and has enacted an extensive set of regulations that effectuate the state's public policy "to conserve the groundwaters of the state and to protect, maintain and improve the quality thereof for present and future beneficial uses through the prevention of pollution, correction of groundwater pollution problems and close control of limited degradation perimeters permitted for necessary economic or social development."  S.D. CODIFIED LAWS § 34A-2-104; S.D. ADMIN. R. 74:54:01–02.

     **C.**    **Threatened Violations Of The Clean Air Act**

    93.    APHIS has recognized that various carcass disposal processes contemplated in its EAs may have significant detrimental impacts on air quality.  In its December 2015 Carcass Management EIS, APHIS acknowledges that the unlined burial disposal method can cause harmful gases from contaminated carcasses to build up and vent through the soil during decomposition.  Released gases can harm plant growth and contaminate air in the surrounding areas, sometimes causing pathogens

---

[62]    Final EA at 13.

from infected birds to be discharged into the atmosphere.  These gases can also accumulate in enclosed underground spaces and cause explosion hazards.[63]

94.    APHIS has also recognized that the open-air burning disposal method similarly threatens air quality by dispersing odor, smoke, pathogens, and other pollutants into the atmosphere, and "[t]here are additional potential impacts to air when the carcasses are contaminated with biological, chemical, and/or radiological agents."[64]

95.    Even the alternative procedures recommended in APHIS's Carcass Management EIS pose potential hazards to air quality, including disposal in rendering facilities, fixed-facility incineration, composting, and landfills.  Despite more controlled environments and reduced risks from these methods, the threat of harmful pollutant emissions is still present.[65]  Both Riverside and San Bernardino County, which collectively have millions of factory-farmed egg laying hens, received an F in the 2019 American Lung Association State of the Air Report.[66]  Burning thousands of birds in or near counties like these can push air quality from bad to dangerously bad.

96.    Accordingly, the actions outlined in the EAs threaten multiple violations of the CAA.  The risk to air quality at the local, state, and national level from the disposal of tens of millions of poultry carcasses nationwide, especially through methods such as incineration, is troubling and should have been more fully analyzed by APHIS.  40 C.F.R. § 1508.27(a) ("the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region . . . and the locality.").

---

[63]    Carcass Management EIS at 76–77.

[64]    *Id.* at 78.

[65]    *Id.* at 79–80.

[66]    *State of the Air Report Card: California*, AMERICAN LUNG ASSOCIATION, http://www.stateoftheair.org/city-rankings/states/california/ (last visited Apr. 6, 2020).

97.     The EAs provide that "[a]ir emissions from rendering, fixed-facility, incineration, and landfilling are regulated through a Federal or State permitting process to minimize releases[,]" and that these disposal methods "are effective at containing pollutants associated with carcasses."[67]  APHIS arrives at this conclusion without citing any study or fact showing that these permitting processes can be safe and environmentally sound when operated at the scale of a major HPAI outbreak, despite acknowledging that such emissions "can impact human health."[68]

98.     Similarly, APHIS fails to make clear whether states are permitted to use open incineration under the program.  By merely stating that air emissions from incineration are subject to "Federal or State permitting process[es] to minimize releases[,]" APHIS does not ensure that open burning will not be used to dispose of large quantities of affected birds.[69]  In an article published by the EPA entitled *Carcass Management During Avian Influenza Outbreaks*, the EPA makes its position clear that incineration, including the use of open pyres, is an "option" for handling diseased poultry carcasses, despite also recognizing that some incineration methods have a detrimental impact on human health and the environment.[70]  For example, the EPA has acknowledged that open pyres "may pose risks to human health and the environment."[71]  In spite of this, APHIS did nothing to limit the use of incineration methods that it clearly knew to be dangerous, and incineration was used to dispose of poultry carcasses infected during the 2015 HPAI outbreak.  Given that even regulated incineration may release ash, particulate matter, dioxins, polyaromatic hydrocarbons,

---

[67]   Final EA at 27.

[68]   *Id.*

[69]   *Id.* at 10, 27.

[70]   *Carcass Management During Avian Influenza Outbreaks*, EPA, https://www.epa.gov/homeland-security-waste/carcass-management-during-avian-influenza-outbreaks (last visited Apr. 6, 2020).

[71]   *Id.*

---

and metals, APHIS has been reckless in allowing open incineration and the uncontrolled harmful effects it produces.  Furthermore, the groundwater and soil contamination that results from open-air burning poses additional clean-up challenges.

99.     Pre-existing state or federal regulation of an industry cannot act as a substitute for the required "hard look" under NEPA.  If it were otherwise, NEPA would be rendered meaningless, as most industries are subject to federal and/or state regulation.  Accordingly, hoped-for compliance with other environmental laws is not a legally sufficient justification for failing to meet the requirements of NEPA.

### D.     Threatened Violations Of The Endangered Species Act, Migratory Bird Treaty Act, And Bald And Golden Eagle Protection Act

100.   Birds listed under the ESA, MBTA, and Bald and Golden Eagle Protection Acts are all at risk of contracting HPAI when they can access carcasses of infected birds.[72]  Indeed, bald eagles are among the wild birds listed in the Final EA as having tested positive for HPAI during the 2014 to 2015 period.[73]

101.   APHIS claims that it is "most likely that [ESA] listed birds would be exposed to HPAI from wild, migratory birds as the viruses circulate in the flyways . . . and the proposed program targets only domestic poultry.  Thus, the proposed action may be of limited benefit to federally listed birds."[74]  However, the issue is not whether the action would "benefit" the birds protected under these statutes; it is

---

[72]     Final EA at 39 ("All bird species federally listed as threatened or endangered in the United States may be susceptible to infection by HPAI[.]").

[73]     *Id.* at 36.

[74]     *Id.* at 39–40.

whether any "takings"[75] of these protected species, or disturbances to their critical habitats, will *definitely not* result from the proposed program.  *See* 16 U.S.C. § 1538.

102.   Particularly troublesome is APHIS's conclusion that "[a]lthough it is possible that [federally] listed scavenging species or bird species could enter barns where carcasses are held prior to composting, there is a great deal of human activity around commercial poultry facilities, and these species would avoid such areas."[76] This incorrectly assumes that there will *always* be significant activity around *all* piles of decaying carcasses, which is a baseless conclusion.  APHIS also incorrectly assumes that these carcasses will always be held inside and fails to provide any explanation for drawing such an erroneous conclusion.  Wild birds can easily access any carcasses that are left outside or unattended inside open facilities.

103.   In any event, the fact that federally listed birds could likely access piles of infected carcasses suggests that the detrimental impact of the HPAI depopulation and disposal methods could be significant on these protected birds, especially considering the speed with which HPAI can spread in the wild and the almost certain fatality of the disease to threatened and endangered species.

104.   Moreover, APHIS claims that "landfilled and buried carcasses are covered with several feet of soil or other material, soon after placement, and that composted carcasses are covered with 8 to 12 inches of clean material such as wood chips."[77]  However, APHIS fails to set out any timeframe within which this covering would need to occur, even though any amount of time that carcasses are left uncovered is a threat to endangered avian species.

---

[75]   The term "take" in this context "means to harass, harm, pursue, hunt, shoot, wound, kill trap, capture, or collect, or attempt to engage is such conduct." 16 USC § 1532(19).

[76]   Final EA at 40.

[77]   *Id.* at 41.

105.   Finally, as mentioned above, the pharmaceuticals used in poultry rearing pose an entirely separate set of problems for protected species.  When certain disposal practices—including burial and incineration—are employed, the drugs used in these processes can enter the environment and linger there for extended periods of time.  APHIS's EAs failed to analyze *any* of the potentially serious impacts on endangered plant and animal species from *any* of the many pharmaceuticals regularly used on poultry throughout the industrial farming industry.  Additionally, neither EA discussed the increase in drugs routinely given to confined birds during disease outbreaks or the detrimental effects posed by the accrual of such drugs in the environment.

## X.   APHIS Improperly Postponed Analyzing The Local Consequences Of The Proposed Action

106.   APHIS also violated NEPA by failing to analyze local environmental impacts in its EAs.  APHIS was required by NEPA to take a "hard look" at the consequences, environmental impacts, and adverse effects of any proposed federal action.  *Nat'l Hwy. Traffic Safety Admin.*, 538 F.3d at 1194; *see also* 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.9.  APHIS's decision to forego such analyses runs counter to the well-established notion that "NEPA is not designed to postpone analysis of an environmental consequence to the last possible moment.  Rather, it is designed to require such analysis *as soon as it can reasonably be done*."  *Kern v. United States BLM*, 284 F.3d 1062, 1072 (9th Cir. 2002) (emphasis added).

107.   As detailed above, the actions proposed in APHIS's EAs threaten to have significant local impacts.  However, despite requirements to do so under NEPA, APHIS's EAs did not address any local environmental conditions at the regional, state or local level.  *See* 40 C.F.R. § 1508.27 ("[I]n the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole.").  While APHIS recognized the existence of divergent regional and local regulations and broadly claimed that it would "evaluate disposal options

based on . . . local conditions[,]"[78] it nonetheless proposed a system in which local impacts are inevitably addressed at the last possible moment—*i.e.*, only *after* HPAI has been detected in a specific area and, in all likelihood, after potentially harmful depopulation and disposal methods have been employed.  Moreover, because the Agency must respond rapidly to stop the spread of disease, ad hoc thoughtful environmental review of local impacts is unlikely to be adequately undertaken.

108.   In the EAs, APHIS failed to consider that even seemingly minor environmental differences among localities can lead to similar depopulation and disposal methods producing drastically different results and environmental impacts.  Even though there is variability at the local level, APHIS could have addressed these differences in its EAs.  For instance, the depth of groundwater in a particular locality should inform the types of disposal methods that APHIS allows.  Because these decisions must be made promptly when responding to HPAI, APHIS should have specified which modes of depopulation and carcass disposal are acceptable based on varying conditions in different regions and localities.  This type of analysis likely cannot be adequately performed immediately before or during an outbreak crisis, as the need to respond in short order does not allow time for thorough environmental review.

## XI.   APHIS's EAs Failed To Consider The Most Likely Scenarios

109.   Although APHIS describes various methods of depopulation and carcass disposal in its EAs, it does not properly address the likelihood that the "preferred" methods will be the ones that are actually carried out.  Further, the final HPAI control plan fails to require that any of the agency's "preferred" methods be used as a condition for federal assistance and indemnification.

---

[78]   Final EA at 7, App'x A.

110.   For instance, the EAs assert that "the use of water-based foam and carbon dioxide are preferred [depopulation] methods during HPAI outbreaks."[79] Additionally, as a result of comprehensive studies, animal scientists have presented high expansion gas-foam filled with nitrogen or carbon dioxide as a viable and more humane form of depopulation.  Yet the EAs also provide that when these methods "cannot be deployed within 24 hours," the dangerous practice of ventilation shutdown "may be applied under limited circumstances."[80]  According to APHIS, VSD is "infrequently used," and this method is selected "on a case-by-case basis."[81]

111.   However, APHIS's proposed depopulation strategy is not realistic in practice.  Indeed, when analyzing the effectiveness of APHIS's "preferred" methods on controlling HPAI outbreaks, the USDA concluded:

> More than one method of depopulation is likely to be required in an HPAI outbreak; carbon dioxide ($CO_2$) and water-based foam have been the most commonly implemented methods during the current outbreak.  However, at the height of outbreak detections, these methods were ***insufficient for rapid depopulation and disposal, and could not be executed quickly enough to halt the production of HPAI*** virus in infected flocks.  As such, APHIS, State, and industry stakeholders acknowledged that other rapid depopulation methods must be considered if HPAI re-emerges in the fall.[82]

The USDA therefore reasoned that "rapid stamping-out" of the infected birds (within 24 hours) was "needed to prevent continued virus shedding and further amplification

---

[79]   *Id.* at 75.

[80]   *Id.* at 10.

[81]   *Id.* at 28.

[82]   *HPAI Outbreak 2014-2015: Ventilation Shutdown Evidence & Policy*, USDA (Sept. 18, 2015), https://www.aphis.usda.gov/animal_health/emergency_management/downloads/hpai/ventilationshutdownpolicy.pdf (emphasis added).

of HPAI."[83]   According to the USDA, under these circumstances VSD is "a necessary alternative" to APHIS's "preferred" methods,[84] meaning that operators are effectively forced to shut down facility ventilation systems until the birds suffocate and are slowly cooked to death.

112.   APHIS's claim that $CO_2$ and water-based foam are the preferred depopulation methods, and that these methods will achieve the Agency's purpose, cannot be reconciled with the USDA's claim that these very methods are inadequate. This is especially true given that other effective and more humane methods exist, such as high expansion nitrogen filled foam.  Indeed, the EAs do not even treat VSD as a *likely* outcome in lieu of the use of $CO_2$ or water-based foams, let alone a *necessary* one.  Even under the allegedly "limited" circumstances when VSD is intended to be used, VSD *still* poses a threat to human physical safety, especially to persons tasked with removing dead birds from their cages.[85]  Moreover, in addition to the substantial pain and suffering that VSD inflicts on birds, the process may not ultimately kill all of the birds, meaning that other methods may still be required.

113.   Because APHIS only considered the effects of using VSD "under limited circumstances,"[86] the EAs are deficient.  APHIS therefore violated NEPA by failing to analyze the direct, indirect, or cumulative effects of using VSD as a primary killing method.

## XII.   APHIS Failed To Adequately Consider Environmental Justice Issues

---

[83]   *Id*. at 1.

[84]   *Id.* at 2 ("The need to control and eradicate HPAI . . . makes VSD a necessary alternative").

[85]   Final EA at 32 ("The ventilation shutdown method . . . may result in elevated levels of ammonia" that pose a threat to workers involved in depopulation efforts.).

[86]   *Id.* at 10.

114.   Executive Order 12898 requires that federal agencies identify and address "disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations."  Exec. Order No. 12898, § 1-101 (Feb. 11, 1994).

115.   Significantly, although the Executive Order does not create a new right to judicial review, a United States District Court in the Central District of California has found that when an agency chooses to consider environmental justice in its analysis (as is required by the Order and as APHIS has done here), that analysis is reviewable under both NEPA and the APA's arbitrary and capricious standard.  *See Crenshaw Subway Coal. v. L.A. Metro. Trans. Auth.*, 2015 WL 6150847, at *29 (C.D. CA Sept. 23, 2015).  Other courts have similarly held that an environmental justice analysis is reviewable under these circumstances.  *See Cmtys. Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678, 689 (D.C. Cir. 2004) (holding that when an agency "exercise[s] its discretion to include the environmental justice analysis in its NEPA evaluation," an environmental justice claim "is properly before this court because it arises under NEPA and the APA" rather than under Executive Order 12898); *Coliseum Square Ass'n, Inc. v. Jackson*, 465 F.3d 215, 232 (5th Cir. 2006), *cert denied*, 552 U.S. 810 (2007) (holding an environmental justice study contained in a NEPA analysis was subject to arbitrary and capricious review).

116.   In the EAs, APHIS stated that "[a]ffected poultry production operations are likely to be in rural areas," but concluded, without further explanation or factual support, that there was "no way to determine in advance how many will be among the rural poor."[87]  Accordingly, APHIS simply adopts yet another wait-and-see approach, under which it proposes to "address minority and low-income population concerns

---

[87]   Final EA at 38.

expressed by individuals as they arise."[88]  However, there is no realistic possibility that APHIS will have time to conduct such a review in the middle of an outbreak.

117.    This unsupported conclusion is troubling.  The USDA is the nation's leading agency responsible for developing, implementing, and analyzing agricultural programs.  When it declares a lack of knowledge regarding the impact that its actions will have on minority populations, this is a cause for citizen concern.

118.    APHIS's purported inability to determine the effects of its action on low-income populations is also contradicted by the USDA's own statistical information about the location of poultry operations nationwide.[89]  Additionally, according to the most recent agricultural census, the USDA even took "special efforts" and "implemented several activities to improve coverage" of socially disadvantaged and minority farm operators.[90]

119.    The correlation between race, income, and exposure to hazardous waste disposal is well documented.  CAFOs are typically located in disenfranchised communities that have limited access to healthcare and, due to community members' close proximity to waste disposal sites and the contamination caused thereby, the disenfranchised are likely to bear the brunt of the harm stemming from inadequate carcass disposal methods.  Research has shown that the waste, pathogens, heavy metals, and odor produced by CAFOs contribute to excessive respiratory and digestive ailments, mood disorders, impaired mental health, and decreased quality of life for the low-income community members living nearby such operations.  These

---

[88]     *Id.*

[89]     *See EJSCREEN:  Environmental Justice Screening and Mapping Tool*, EPA, https://www.epa.gov/ejscreen (last visited April 6, 2020).

[90]     *See* USDA, 2012 CENSUS OF AGRICULTURE, at IX, App'x A-1–A-6 (2014), https://www.agcensus.usda.gov/Publications/2012/Full_Report/Volume_1,_Chapter_2_US_State_Level/st99_2_001_001.pdf.

adverse health impacts are only exacerbated when inadequate carcass disposal methods are used to cull large populations of diseased poultry.

120.   In January 2017, the EPA issued a letter to the North Carolina Department of Environmental Quality expressing "deep concern about the possibility that African Americans, Latinos, and Native Americans have been subjected to discrimination as the result of NC DEQ's operation of the Swine Waste General Permit program, including the 2014 renewal of the Swine Waste General Permit."[91] This reflects the EPA's acknowledgement that factory farm waste disposal disproportionally impacts minority communities.

121.   It is exceptionally troubling that APHIS's environmental justice conclusions make no attempt to measure the impact on minority populations.  In the Final EA, APHIS simply notes that it would be "speculative" to determine when impacts may occur, what APHIS could do to reduce any potential impacts, and the extent to which "minority populations 'off of the farm' may be impacted by a particular outbreak."[92]  This rationale is belied by the existence of relevant environmental justice information as noted above, and is plainly insufficient to satisfy NEPA, which requires either an analysis of likely impacts or a determination that the impacts are unlikely.

122.   The deficient analysis in APHIS's EA also directly conflicts with the conclusion that APHIS makes in its corresponding FONSI.  In the FONSI, Defendant Dr. Burke Healy addresses this important issue in a single sentence that states:  "the preferred alternative poses no disproportionate adverse effects to minority and low-

---

[91]   Letter from Lilian S. Dorka, US EPA, to William G. Ross, Jr., NC Dept. of Enviro. Quality (Jan, 12, 2017), https://www.epa.gov/sites/production/files/2018-05/documents/letter_of_concern_to_william_g_ross_nc_deq_re_admin_complaint_11r-14-r4_.pdf.

[92]   Final EA at 79.

income populations[.]"[93]   However, the FONSI cites no evidence to support this conclusory determination, and it contradicts APHIS's assertion in the EA that there was "no way to determine" any such impacts in advance.[94]   Defendant Healy lacked a factual basis for this conclusion, and any adequate consideration of available information would have compelled APHIS to conduct a more thorough environmental justice analysis.

## XIII.  APHIS's Preparation Of The Carcass Management EIS Further Demonstrates The Need For A HPAI-Specific EIS

123.   In December 2015—nearly simultaneous to the release of the Final EA—APHIS also released its lengthy Carcass Management EIS, which "analyzes the environmental effects associated with various carcass management alternatives that could be implemented during a mass animal health emergency."[95]   The Carcass Management EIS details various "improved carcass management options," including "landfill, rendering, incineration, composting, and non-standard methods, rather than the traditional options of unlined burial and open-air burning."[96]   The fact that APHIS considered substitutes in the Carcass Management EIS for the dangerous practices *that are permissible under the preferred approach in the Final EA* further demonstrates the existence of these viable but unexamined alternatives.

124.   More generally, if carcass management itself requires an EIS, then it follows that a depopulation and disposal program incorporating carcass management must also warrant an EIS.  Although APHIS attempts to use the Carcass Management EIS as a substitute for an HPAI-specific EIS,[97] agencies cannot avoid preparing an

---

[93]     FONSI at 1.

[94]     Final EA at 38.

[95]     Carcass Management EIS at v.

[96]     *Id.* at 2.

[97]     *See* Final EA at 77.

EIS by segmenting action.  *See Nat'l Audubon Soc'y v. Butler*, 160 F. Supp. 2d 1180, 1189 (W.D. Wash. 2001); 40 C.F.R. § 1508.27(b)(7).

125.   NEPA requires that an EIS accompany "*every* recommendation or report on proposals for . . . major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C) (emphasis added).

126.   An EIS was necessary because the HPAI outbreak control activities proposed in the EAs may significantly affect the human environment.  HPAI has virulently spread across the country in recent years, threatening human health, animal welfare, and the environment, and leaving tens of millions of dead birds in its wake. In a comparable situation that dealt exclusively with carcass disposal, APHIS explicitly acknowledged that NEPA demands the comprehensive consideration of an EIS.[98]  The Agency has not explained—and cannot explain—how one subset of a problem (carcass disposal) warrants an EIS, yet the problem as a whole (killing millions of animals, disinfecting massive facilities, and carcass disposal) somehow does not have a significant impact on the human environment.

## XIV.  Future Outbreaks Requiring Implementation Of USDA's Unsafe HPAI Control Plan Are Imminent And Inevitable

127.   Recent events involving the rapid spread of infectious diseases throughout the world demonstrate the reality that future avian influenza outbreaks in the United States are imminent, inevitable, and likely to have severe consequences. While the COVID-19 crisis has dominated headlines for much of 2020 and forced governments and populations to reassess their preparedness to respond to pandemic-scale contagions, numerous strains of the flu virus, including HPAI, continue to infect bird and animal populations across the globe at an alarming rate.  As early as 2006, the U.S. Homeland Security Council published a National Strategy for Pandemic Influenza, which recognizes that "avian, or bird, viruses played a role in the last three

---

[98]      *See* Carcass Management EIS.

pandemics[,]" and "history suggests . . . another novel influenza virus will emerge at some point in the future and threaten an unprotected human population."[99]

128.    As explained in a June 2020 publication in the journal of Neuroepidemiology titled "What the COVID-19 Crisis Is Telling Humanity", "the massive overcrowding of animals for human consumption in industrial 'factory farm' environments" is a "well-recognized source for increasingly lethal human zoonoses."[100]  The article also explains that a new strain of avian influenza "has been considered one of the most concerning of all pandemic threats over the past few years."[101]  This particular strain, H7N9, is known to have infected more than 1,500 humans with a case fatality rate of 40%, leading experts to warn that "[i]f H7N9 achieves sustained human-to-human transmission, it would arguably be the worst health and national security threat faced by the world in literally a century."[102]  The CDC has also recognized this novel influenza strain as "having the greatest potential to cause a pandemic."[103]

129.    Avian Influenza has been detected in poultry populations throughout California in the years since the 2014–15 HPAI outbreak.[104]  As recently as 2018,

---

[99]    HOMELAND SECURITY COUNCIL, NATIONAL STRATEGY FOR PANDEMIC INFLUENZA IMPLEMENTATION PLAN 15, (May 2006), https://www.cdc.gov/flu/pandemic-resources/pdf/pandemic-influenza-implementation.pdf?fbclid=IwAR0L2Mdh6-pwWYpDQ_pcvSRWRM6T772WNTqGfIp2pk9G2nm6ahP2d-2VsOc.

[100]    David O. Wiebers & Valery L. Feigin, *What the COVID-19 Crisis Is Telling Humanity*, 54 NEUROEPIDEMIOLOGY 283, 284 (2020), https://www.karger.com/Article/FullText/508654.

[101]    *Id.* at 285.

[102]    *Id.*

[103]    *Asian Lineage Influenza A (H7N9) Virus*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/flu/avianflu/h7n9-virus.htm.

[104]    *See, e.g.*, *Avian Influenza Updates*, CAL. DEP'T OF FOOD AND AGRIC., https://www.cdfa.ca.gov/AHFSS/Animal_Health/Avian_Influenza.html (listing Avian Influenza outbreaks in California since 2015).

---

California was recognized as having environmental conditions "favorable for AIV [Avian Influenza Virus] presence, and thus future outbreaks (in poultry and waterfowl) are likely to occur" in high risk areas across the state, including in counties located within this District.[105]

130.   Furthermore, the day after this lawsuit was initiated, USDA confirmed the presence of HPAI in South Carolina.[106]   Communication with USDA revealed that, as authorized by the Agency's control plan, a water-based foam was deployed as the method of depopulating around 30,000 turkeys.   The outbreak is reported as ongoing as of July 9, 2020.[107]

131.   As recently as July 2020, the Irish government announced it will be reimbursing poultry farmers affected by an outbreak of low pathogenic avian influenza (LPAI) over the past four months, which has been reported to have "pandemic potential."[108]   At least a dozen flocks in Ireland have been infected with

---

[105]   Jaber Belkhiria et al., *Identification of High Risk Areas for Avian Influenza Outbreaks in California Using Disease Distribution Models*, PLOS ONE, Jan. 2018, at 9, 11, https://doi.org/10.1371/journal.pone.0190824.

[106]   *USDA Confirms Highly Pathogenic H7N3 Avian Influenza in a Commercial Flock in Chesterfield County, South Carolina*, USDA (May 13, 2020), https://www.aphis.usda.gov/aphis/newsroom/stakeholder-info/sa_by_date/sa-2020/sa-04/hpai-sc.

[107]   *Highly Pathogenic Avian Influenza (HPAI) Report N° 11: May 29 to June 18, 2020*, WORLD ORGANISATION FOR ANIMAL HEALTH (July 9, 2020), https://www.oie.int/fileadmin/Home/eng/Animal-Health-in-the-World/docs/pdf/OIE-AI-situation-report/HPAI-asof09072020.pdf ("One ongoing outbreak is still present in the United States of America in poultry (H7N3) since April, 2020").

[108]   Neil Michael, *Government Fund for Farmers Hit by Bird Flu with "Pandemic Potential"*, IRISH EXAMINER (July 7, 2020), https://www.irishexaminer.com/breakingnews/ireland/government-fund-for-farmers-hit-by-bird-flu-with-pandemic-potential-1009740.html.

---

the strain since February of this year, resulting in the culling of nearly a half a million birds.[109]

132.   A study published in April 2020 identified the recent emergence of a new strain of swine flu that can infect humans.[110]  Reports from June 2020 indicate the strain has "pandemic potential," and it is considered by experts to be a worldwide threat that could have devastating consequences if it mutates to spread more easily from person to person.[111]

133.   A new United Nations report released in the wake of the COVID-19 crisis provides a scientific assessment aimed at "Preventing the Next Pandemic", and identifies "human-mediated factors [that] are most likely driving the emergence of zoonotic diseases."[112]  Unsurprisingly, the factors highlighted in the report include a growing demand for animal protein, unsustainable farming practices, and the global climate crisis.[113]  The report advises that "[a]doption of animal welfare standards for the care, housing and transport of live animals along the entire supply chain is also needed to reduce risk of zoonotic disease transmission."[114]

---

[109]   *Id.*

[110]   Honglei Sun et al., *Prevalent Eurasian Avian-Like H1N1 Swine Influenza Virus with 2009 Pandemic Viral Genes Facilitating Human Infection*, PROCEEDINGS OF THE NAT'L ACADEMY OF SCIENCES OF THE U.S.A. (June 29, 2020), https://www.pnas.org/content/early/2020/06/23/1921186117.

[111]   Michelle Roberts, *Flu Virus with 'Pandemic Potential' Found in China*, BBC NEWS (June 30, 2020), https://www.bbc.com/news/health-53218704.

[112]   UNITED NATIONS ENVIRONMENT PROGRAM, PREVENTING THE NEXT PANDEMIC 7 (2020), https://wedocs.unep.org/bitstream/handle/20.500.11822/32316/ZP.pdf?sequenc e=1&isAllowed=y.

[113]   *Id.*

[114]   *Id.* at 49.

---

134.   Another report published in July 2020, entitled *Food & Pandemics Report, Part 1: Making the Connection: Animal-Based Food Systems and Pandemics*, states that "[c]ramming large numbers of genetically similar individuals into unsanitary, high-density settings that induce poor health and high stress levels strongly increases the chances of pathogenic spillovers between wild animals and farmed animals, and ultimately humans."[115]  Chief of the Terrestrial Ecosystems Unit of the United Nations Environmental Programme (UNEP) explains that this report "clearly demonstrates the connection between industrial animal production and the increased risk of pandemics. Never before have so many opportunities existed for pathogens to jump from wild and domestic animals to people."[116]

135.   Indeed, USDA's own actions, including those discussed above, albeit neither sufficient to effectively mitigate the spread of HPAI nor to evaluate the environmental impacts of its control plan, indicate that the imminent threat of a HPAI outbreak is realistic and serious.  The risk is considered so serious and imminent that the Agency has spent significant resources on developing a control plan and on bird flu vaccine development.[117]  As APHIS describes it, "there has been a tremendous amount of preparedness planning based on past outbreaks of HPAI in the United States and worldwide . . . HPAI remains a high-priority concern for USDA APHIS."[118]  The Agency's 2021 budget allocates $5,725,000 (an increase of $19,000

---

[115]   PROVEG INT'L, FOOD & PANDEMICS REPORT, PART 1: MAKING THE CONNECTION, ANIMAL-BASED FOOD SYSTEMS AND PANDEMICS 36 (2020), https://proveg.com/wp-content/uploads/2020/07/PV_Food_and_Pandemics_Report_Digital.pdf.

[116]   *Id*. at 2.

[117]   *USDA Adds Avian Influenza Vaccine Doses to the National Veterinary Stockpile*, USDA APHIS (Nov. 18, 2019), https://www.aphis.usda.gov/aphis/newsroom/stakeholder-info/sa_by_date/sa_2015/sa_10/ct_ai_vaccines.

[118]   APHIS Red Book at 1-2–1-3.

---

over the previous budget) and a full seven years of staff time to the National Veterinary Stockpile, the purpose of which is to respond with supplies and expertise within 24 hours of an outbreak of the "most damaging animal diseases, including highly pathogenic avian influenza."[119]

136.    Other federal government agencies are also responding to the imminent HPAI pandemic threat.  For instance the CDC recommends general precautions and monitors the risk level of known influenza outbreaks.[120]  According to the CDC, because avian influenza continues to circulate and has been responsible for a number of human infections, "preparedness efforts have been extensive," and vaccines are "being stockpiled for pandemic preparedness by the United States government."[121]  According to one CDC expert, "the [avian influenza] virus's propensity to change presents unique challenges, and each human case of infection with an animal influenza virus represents the potential for a pandemic."[122]

137.    In sum, the occurrence of future HPAI outbreaks throughout the United States is not a question of "if," but "when."  In the event of another inevitable outbreak, implementation of the Agency's HPAI control plan will yield extremely

---

[119]    USDA, 2021 USDA BUGDET EXPLANATORY NOTES FOR COMMITTEE ON APPROPRIATIONS 22-35–22-36 (2020), https://www.usda.gov/sites/default/files/documents/mrp-aphis-fy2021-congressional-justifications.pdf.

[120]    *Summary of Influenza Risk Assessment Results*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/flu/pandemic-resources/monitoring/irat-virus-summaries.htm.

[121]    *Asian Avian Influenza A (H5N1)*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/flu/avianflu/h5n1-virus.htm.

[122]    *Stopping An Avian Influenza Threat to Animal and Public Health: Hearing Before the S. Comm. on Homeland Security and Governmental Affairs*, 114th Cong. 6 (2015) (statement of Anne Schuchat, M.D., Director, Nat'l Ctr. for Immunization and Respiratory Diseases, CDC, and Assistant Surgeon Gen., U.S. Public Health Serv., U.S. Dep't of Health and Human Servs.).

---

damaging consequences, as it continues to endorse unsafe factory farming, depopulation, and disposal practices that further incubate and spread disease.  For the myriad reasons described in this Complaint, APHIS's legally deficient assessment of environmental impacts posed by the Agency's HPAI control plan, along with its failure to adequately consider a range of reasonable and safer alternatives, threaten concrete and probable harm to Plaintiffs, the environment, and public health at large.

## CLAIMS FOR RELIEF

**Claim One:  The USDA Violated NEPA By Failing To Evaluate A Reasonable Range Of Alternative Actions.**

138.   The allegations of all prior paragraphs are incorporated by reference.

139.   APHIS violated NEPA by failing to undertake a thorough and objective evaluation of a reasonable range of alternative actions in the July 2015 EA, the Final EA, and the FONSI.  This claim is brought pursuant to the judicial review provision of the APA, 5 U.S.C. § 706(2).

140.   NEPA requires all federal agencies to undertake a thorough and public analysis of the environmental consequences of proposed federal actions, including a reasonable range of alternative actions.

141.   APHIS's EAs and FONSI violate NEPA and APA in failing to rigorously explore and objectively evaluate all reasonable alternatives.

142.   For the foregoing reasons, APHIS's preparation and approval of its HPAI control plan, as contained in its EAs and the FONSI, is arbitrary, capricious, an abuse of discretion, and not in accordance with law under NEPA and the APA.

**Claim Two:  The USDA Violated NEPA And The APA By Approving Arbitrary And Capricious Environmental Assessments And The FONSI.**

143.   The allegations of all prior paragraphs are incorporated by reference.

144.   APHIS violated NEPA by failing to undertake a thorough and objective "hard look" at the environmental impacts of its activities proposed in the July 2015

EA, the Final EA, and the FONSI.  This claim is brought pursuant to the judicial review provision of the APA, 5 U.S.C. § 706(2).

145.   NEPA requires all federal agencies to undertake a thorough and public analysis of the environmental consequences of proposed federal actions, including:  a description of baseline conditions; a reasonable range of alternative actions, including a "no action" alternative; and a thorough evaluation of the direct, indirect, and cumulative impacts of proposed actions.

146.   APHIS's EAs and FONSI violate NEPA and APA in the following ways, each of which is a distinct and separate violation of law:

    (a)    APHIS improperly segmented its analysis;

    (b)    APHIS failed to take a "hard look" at the direct, indirect, and cumulative impacts of the most likely scenarios that will result from the proposed action; and

    (c)    APHIS failed to adequately consider environmental justice issues.

147.   For the foregoing reasons, APHIS's preparation and approval of its HPAI control plan, as contained in its EAs and the FONSI, is arbitrary, capricious, an abuse of discretion, and not in accordance with law under NEPA and the APA.

**Claim Three:  The USDA Violated NEPA By Failing To Prepare An EIS On The Proposed Action.**

148.   The allegations of all prior paragraphs are incorporated by reference.

149.   APHIS violated NEPA by refusing to prepare a NEPA-compliant EIS for its HPAI outbreak control activities, notwithstanding available information showing these activities may have a significant adverse effect on the human environment.

150.   APHIS's HPAI outbreak control activities may have a significant effect on the human environment for reasons including but not limited to the following:

    (a)    APHIS's activities encompass an immensely broad geographic area:  the entire United States;

(b)     The proposed action threatens violations of the CWA, CAA, ESA, MBTA, and Bald and Golden Eagle Protection Act, and various state laws;

(c)     The proposed action may adversely affect endangered or threatened species and habitats that have been determined to be critical under the ESA;

(d)     The proposed action improperly postpones analyses of its local environmental impacts until the last possible moment;

(e)     It is reasonable to anticipate that the proposed action will have a cumulatively significant impact on the environment; and

(f)     APHIS improperly segmented its analysis by preparing an EIS for only one portion of the proposed action, carcass management, as a substitute for an assessment of the entirety of the proposed action's impact.

151.    The decision not to prepare an EIS for APHIS's HPAI control plan was therefore arbitrary and capricious, an abuse of discretion, not in accordance with NEPA, 42 U.S.C. § 4332, 40 C.F.R. § 1502.9(c), and must be set aside. 5 U.S.C. §§ 701–706.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that the Court:

A.      Order, adjudge, and declare that APHIS violated NEPA, NEPA's implementing regulations and policies, and the APA by refusing to prepare an EIS analyzing the full range of its HPAI outbreak control activities;

B.      Order, adjudge, and declare that APHIS violated NEPA, NEPA's implementing regulations and policies, and/or the APA in approving the EAs and FONSI without taking the required NEPA "hard look" at actions, alternatives, and environmental impacts;

C.      Reverse, vacate and set aside APHIS's EAs and FONSI;

D.    Remand the HPAI control plan to APHIS for reconsideration under NEPA;

E.    Order APHIS to prepare an EIS that satisfies the requirements of NEPA; and

F.    Grant such further and other relief as the Court deems just and proper to remedy Defendants' violations of law and protect the wildlife and people of the United States.

1

Dated:    July 27, 2020

Respectfully submitted,

2

**SHEARMAN & STERLING LLP**

3

By:    /s/ Daniel Wiener
Daniel Wiener (*pro hac vice*)

4

John Gueli
Sam Jolly (*pro hac vice*)

5

Elizabeth Robinson (*pro hac vice*)
Sophia Zander (*pro hac vice*)

6

599 Lexington Avenue
New York, NY 10022-6069

7

(212) 848-4000
jgueli@shearman.com

8

sam.jolly@shearman.com
liz.robinson@shearman.com

9

daniel.wiener@shearman.com
sophia.zander@shearman.com

10

*Attorneys for Plaintiffs, The Humane*
*Society of the United States, Mercy For*

11

*Animals, and Farm Sanctuary*

12

13

**THE HUMANE SOCIETY OF THE**
**UNITED STATES**

14

By:    /s/ Peter Brandt

15

Peter Brandt
Laura J. Fox (*pro hac vice*)

16

1255 23rd Street, NW, Suite 450
Washington, DC 20037

17

(202) 452-1100
pbrandt@humanesociety.org

18

lfox@humanesociety.org

19

*Attorneys for Plaintiff, The Humane*
*Society of the United States*

20

21

22

23

24

25

26

27

28